# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 3, 2020         Decided March 10, 2020

No. 19-5288

IN RE: APPLICATION OF THE COMMITTEE ON THE JUDICIARY, U.S. HOUSE OF REPRESENTATIVES, FOR AN ORDER AUTHORIZING THE RELEASE OF CERTAIN GRAND JURY MATERIALS,

COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES,
APPELLEE

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-gj-00048)

———

*Mark R. Freeman*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Hashim M. Mooppan*, Deputy Assistant Attorney General, and *Michael S. Raab* and *Brad Hinshelwood*, Attorneys.

*Douglas N. Letter*, General Counsel, U.S. House of Representatives, argued the cause for appellee. With him on

the brief were *Todd B. Tatelman*, Deputy General Counsel, *Megan Barbero* and *Josephine Morse*, Associate General Counsel, *Adam A. Grogg* and *William E. Havemann*, Assistant General Counsel, *Jonathan B. Schwartz*, Attorney, *Annie L. Owens*, *Mary B. McCord*, and *Daniel B. Rice*.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Ashwin P. Phatak* were on the brief for *amicus curiae* Constitutional Accountability Center in support of the Committee on the Judiciary, U.S. House of Representatives.

Before: ROGERS, GRIFFITH, and RAO, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Concurring opinion by *Circuit Judge* GRIFFITH.

Dissenting opinion by *Circuit Judge* RAO.

ROGERS, *Circuit Judge*:

> Article I of the United States Constitution provides that the House of Representatives "shall have the sole Power of Impeachment." U.S. CONST. art. I, § 2, cl. 5. Further, the Senate "shall have the sole Power to try all Impeachments." *Id.* § 3, cl. 6.

The Committee on the Judiciary of the U.S. House of Representatives seeks to obtain the redacted grand jury materials referenced in the Special Counsel's Report in connection with its impeachment investigation of President Donald J. Trump. The district court authorized the disclosure of these grand jury materials pursuant to the "judicial proceeding" exception in Federal Rule of Criminal Procedure

6(e)(3)(E)(i). For the following reasons, because that exception encompasses impeachment proceedings and the Committee has established a "particularized need" for the grand jury materials, the Order of the district court is affirmed.

**I.**

In May 2017, Deputy U.S. Attorney General Rod Rosenstein appointed Robert S. Mueller, III, as Special Counsel to investigate Russian interference in the 2016 presidential election, including any links or coordination between the Russian government and individuals associated with President Trump's election campaign. As part of this investigation, a grand jury sitting in the District of Columbia "issued more than 2,800 subpoenas" and almost 80 witnesses testified before the grand jury. Special Counsel Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016 Presidential Election, Vol. I at 13 (March 2019) ("The Mueller Report"). In addition, the Special Counsel's Office interviewed "approximately 500 witnesses" under oath, *id.*, including members of the Administration.

On March 22, 2019, the Special Counsel submitted his confidential two-volume report to the Attorney General pursuant to 28 C.F.R. § 600.8(c). Volume I summarizes Russian interference in the 2016 presidential election and describes the "numerous links between the Russian government and the Trump Campaign." Vol. I at 1–3. Nevertheless, the Special Counsel concluded that "the investigation did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities." *Id.* at 2. Volume II outlines the Special Counsel's examination of whether the President obstructed justice in connection with the Russia-related investigations. The Special Counsel declined to

exonerate the President. Citing to an opinion issued by the Office of Legal Counsel, the Special Counsel stated that indicting or criminally prosecuting a sitting President would violate the separation of powers. Notably, for purposes of the Committee's need for the redacted grand jury materials, the Special Counsel stated that a federal indictment would "potentially preempt constitutional processes for addressing presidential misconduct." Vol. II at 1 (citing U.S. CONST. art. I, § 2, cl. 5; § 3, cl. 6).

The Attorney General released a public version of the Mueller Report in April 2019, with redactions for grand jury materials, and other information that he determined could compromise ongoing intelligence or law enforcement activities, harm ongoing criminal matters, or unduly infringe upon the personal privacy interests of peripheral third parties. Letter from Attorney General Barr to Senate Judiciary Chairman Graham and Ranking Member Feinstein, and House Judiciary Chairman Nadler and Ranking Member Collins (Apr. 18, 2019). The Assistant Attorney General wrote the Committee that certain members of Congress, including the Chairman and Ranking Members of the House Judiciary Committee, could review an unredacted version of the Report, except for redactions relating to grand jury information, which the Attorney General claimed he was prohibited from disclosing to Congress by law citing Rule 6(e). Letter from Assistant Attorney General Boyd to Senate Judiciary Chairman Graham and House Judiciary Chairman Nadler (Apr. 18, 2019).

In October 2019, the House of Representatives passed House Resolution 660, which directed six committees, including the House Judiciary Committee and the House Intelligence Committee, to continue their ongoing impeachment investigations. H. Res. 660, 116th Cong. (2019).

On December 18, 2019, the full House adopted two Articles of Impeachment against President Trump. H. Res. 755, 116th Cong. (2019). The first Article of Impeachment, "Abuse of Power," alleges that President Trump "solicited the interference of a foreign government, Ukraine, in the [upcoming] 2020 United States Presidential election." *Id*. at 1. The second Article, "Obstruction of Congress," alleges that President Trump "directed the unprecedented, categorical, and indiscriminate defiance of subpoenas issued by the House of Representatives." *Id.* at 2.

The House Judiciary Committee's Report on the Impeachment of President Trump asserts that the conduct described by these Articles is consistent with the President's "inviting and welcoming Russian interference in the 2016 United States Presidential election," H. Rep. No. 116-346, at 127 (2019), and the President's "endeavor to impede the Special Counsel's investigation into Russian interference . . . as well as [his] sustained efforts to obstruct the Special Counsel after learning that he was under investigation for obstruction of justice," *id.* at 159–60. The Committee Report also makes clear that although two Articles of Impeachment have been approved, the Committee's impeachment investigation related to the Mueller Report is ongoing. *Id.* at 159 n.928; *see also* Appellee's Supp. Br. 17 (Dec. 23, 2019); Oral Arg. Tr. at 59–60 (Jan. 3, 2020).

On July 26, 2019, the House Judiciary Committee filed an application for an order authorizing the release of certain grand jury materials related to the Mueller Report pursuant to Rule 6(e)(3)(E)(i). The Committee requested three categories of grand jury materials: (1) all portions of the Mueller Report that were redacted pursuant to Rule 6(e); (2) any portions of grand jury transcripts or exhibits referenced in those redactions; and (3) any underlying grand jury testimony and exhibits that relate

directly to certain individuals and events described in the Mueller Report. The Committee proposed a "focused and staged disclosure" of the first two categories of material, to be followed as necessary by disclosure of the third category. *In re App. of Comm. on Judiciary, U.S. House of Representatives, for an Order Authorizing Release of Certain Grand Jury Materials* ("*App. for Mueller Report Grand Jury Materials*"), 2019 WL 5485221, at \*33 (D.D.C. Oct. 25, 2019) (internal quotation marks and citation omitted). The Department of Justice, which is the custodian of the grand jury records, *see* Rule 6(e)(1), opposed the application and submitted an *ex parte* declaration disclosing the contents of the Rule 6(e) redactions in Volume II and Appendix C of the Mueller Report for the district court to review *in camera*. The record indicates that the district court reviewed this declaration but that the district court did not receive or review any of the grand jury materials redacted in Volume I of the Report, nor any of the grand jury transcripts or exhibits referenced in these redactions.

On October 25, 2019, the district court granted the Committee's application. The district court concluded that a Senate impeachment trial is a "judicial proceeding" under Rule 6(e). *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at \*11. The court noted that "historical practice, the Federalist Papers, the text of the Constitution, and Supreme Court precedent all make clear" that "impeachment trials are judicial in nature and constitute judicial proceedings." *Id.* at \*14; *see also id.* at \*14–19. The court further explained that, in any event, it was bound by circuit precedent to conclude that an impeachment trial is a "judicial proceeding," citing *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (*en banc*) and *McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019). *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at \*19. The district court also found that the Committee established a "particularized need" because the Committee's

compelling need for the requested material to "investigate fully" and "to reach a final determination about conduct by the President described in the Mueller Report," *id.* at *35, outweighs any remaining grand jury secrecy interests, *id.* at *37–38, and the requested disclosure was tailored to this need, *id.* at *38.

The district court therefore authorized the disclosure of the first two categories of requested grand jury information: all portions of the Mueller Report redacted pursuant to Rule 6(e) and any portions of grand jury transcripts or exhibits referenced in those redactions. *Id.* The court ordered the Department to provide these materials to the Committee by October 30, 2019. *Id.* The court also stated that the Committee could file additional requests articulating its particularized need for the third category of grand jury materials requested in its initial application. *Id.*

The Department appealed and sought a stay pending appeal from the district court and from this court. The district court denied a stay pending appeal. This court entered an administrative stay on October 29, 2019, held oral argument on the stay motion on November 18, 2019, and then extended the administrative stay setting the case for expedited briefing and oral argument on the merits on January 3, 2020.

**II.**

The Committee asks this court to interpret and apply Rule 6(e) — which is "a familiar judicial exercise." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). Rule 6(e) codifies the "long-established policy" of maintaining grand jury secrecy. *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958). Rule 6(e)(2)(B) provides that "a matter occurring before the grand jury" must not be disclosed by grand

jurors, interpreters, court reporters, government attorneys, or other persons specifically listed in the Rule. Although Rule 6(e) "makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule," the Rule "sets forth in precise terms to whom, under what circumstances and on what conditions grand jury information may be disclosed." *McKeever*, 920 F.3d at 844 (quoting *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981)), *cert. denied*, 2020 WL 283746 (Jan. 21, 2020). Rule 6(e)(3)(E) provides a list of "exceptions" to grand jury secrecy, including five circumstances in which a "court may authorize disclosure . . . of a grand-jury matter." As relevant here, Rule 6(e)(3)(E)(i) permits a court to authorize disclosure "preliminarily to or in connection with a judicial proceeding," where the person seeking disclosure has shown a "particularized need" for the requested grand jury materials, *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983).

The grand jury functions to a large degree at "arm's length" from the judicial branch, *United States v. Williams*, 504 U.S. 36, 47 (1992), but it operates under the auspices of the district court in which it is convened, *see* Rule 6(a); 28 U.S.C. § 1861 *et seq.*, and "depend[s] on the judiciary in its role as an investigative body," *United States v. Seals*, 130 F.3d 451, 457 (D.C. Cir. 1997). The district court has supervisory jurisdiction over the grand jury. *Morrison v. Olson*, 487 U.S. 654, 681 n.20 (1988). Although the district court's authority over the grand jury is limited, *Williams*, 504 U.S. at 47–50, courts may exercise control over the grand jury in several significant respects, including the power to summon and empanel the grand jury and the power to discharge the grand jury, Rule 6(a), (g). Courts also may control access to the records of a grand jury investigation conducted under the court's auspices. As noted, Rule 6(e) codifies and defines that authority and

prescribes the procedures for its exercise. The Committee's Rule 6(e)(3)(E)(i) application asks the district court to exercise its continuing supervisory jurisdiction concerning the grand jury to authorize and order the release of grand jury records.

Numerous courts have recognized that grand jury records are court records. *Carlson v. United States*, 837 F.3d 753, 758–59 (7th Cir. 2016); *Standley v. Dep't of Justice*, 835 F.2d 216, 218 (9th Cir. 1987); *In re Grand Jury Investigation of Cuisinarts, Inc.*, 665 F.2d 24, 31 (2d Cir. 1981); *United States v. Penrod*, 609 F.2d 1092, 1097 (4th Cir. 1979). "The grand jury minutes and transcripts are not the property of the Government's attorneys, agents or investigators . . . . Instead those documents are records of the court." *Procter & Gamble Co.*, 356 U.S. at 684–85 (Whittaker, J., concurring). But even where doubt is expressed whether grand jury records are judicial records, Rule 6(e)(3)(E) vests courts with control over the disclosure of these records and courts exercise this control "by ordering 'an attorney for the government' who holds the records to disclose the materials," *McKeever*, 920 F.3d at 848 and *id.* (quoting Rule 6(e)(1)).

Although the grand jury "has not been textually assigned . . . to any of the branches," *Williams,* 504 U.S. at 47, it "remains an appendage of the court," *Seals*, 130 F.3d at 457 (quoting *Brown v. United States*, 359 U.S. 41, 49 (1959), *overruled on other grounds by Harris v. United States,* 382 U.S. 162 (1965)). Grand jury records do not become Executive Branch documents simply because they are housed with the Department of Justice. For instance, in the Freedom of Information Act context, where "documents remain within the control of the court and the grand jury," those documents are not "agency records" and are not subject to FOIA's disclosure requirements that otherwise apply to agency documents even if they are in the possession of the Department

of Justice. *Tigar & Buffone v. Dep't of Justice*, 590 F. Supp. 1012, 1014–15 (D.D.C. 1984). As the Ninth Circuit has explained, "were court documents deemed 'agency records' for purposes of the FOIA when held by the [Department], the Act would encroach upon the authority of the courts to control the dissemination of its documents to the public." *Warth v. Dep't of Justice*, 595 F.2d 521, 523 (9th Cir. 1979). This court has applied similar reasoning to congressional documents transmitted from Congress to the Executive. *Am. Civil Liberties Union v. CIA*, 823 F.3d 655, 667–68 (D.C. Cir. 2016).

In short, it is the district court, not the Executive or the Department, that controls access to the grand jury materials at issue here. The Department has objected to disclosure of the redacted grand jury materials, but the Department has no interest in objecting to the release of these materials outside of the general purposes and policies of grand jury secrecy, which as discussed, do not outweigh the Committee's compelling need for disclosure. Even if the Department had not objected to disclosure, the district court would still need to authorize disclosure pursuant to Rule 6(e)'s "judicial proceeding" exception. *See, e.g.*, *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives* ("*In re 1972 Grand Jury Report*"), 370 F. Supp. 1219, 1227 (D.D.C. 1974). Requests for grand jury materials pursuant to Rule 6(e)(3)(E)(i) necessarily require resolution by the courts.

## III.

On the merits, the Department maintains that the district court erred in concluding that *Haldeman* and *McKeever* establish binding precedent on the correct meaning of the term "judicial proceeding" in Rule 6(e). Appellant's Br. 13. Reviewing *de novo* the district court's interpretation of Rule

6(e), *see United States v. McIlwain*, 931 F.3d 1176, 1181 (D.C. Cir. 2019), these precedents establish that a Senate impeachment trial qualifies as a "judicial proceeding" under the Rule.

In *In re 1972 Grand Jury Report*, Chief Judge Sirica ordered the disclosure of the grand jury report and accompanying materials to be delivered to the House Judiciary Committee, which was then engaged in an impeachment investigation of President Richard M. Nixon. 370 F. Supp. at 1230–31. This court denied mandamus relief in *Haldeman*, holding that Chief Judge Sirica had not abused his discretion in ordering the release of these materials. 501 F.2d at 715–16. Significantly, this court expressed "general agreement with his handling of these matters," observing that Chief Judge Sirica "dealt at length" with the contention that Rule 6(e) limits the disclosure of grand jury materials "to circumstances incidental to judicial proceedings and that impeachment does not fall into that category." *Id.* at 715. Judge MacKinnon's partial concurrence concluded that the disclosure fit within the Rule 6(e) exception for judicial proceedings. *Id.* at 717.

Even assuming that the court's opinion in *Haldeman* was "ambiguous" as to whether the disclosure of grand jury materials to Congress was permitted under the "judicial proceeding" exception or the court's inherent authority, *see McKeever*, 920 F.3d at 847 n.3, this court's decision in *McKeever* clarified that district courts lack inherent authority outside of the exceptions listed in Rule 6(e) to order disclosure of grand jury material, *id.* at 844, and understood *Haldeman* to conclude that impeachment "fit[] within the Rule 6 exception for 'judicial proceedings,'" *id.* at 847 n.3 (quoting *Haldeman*, 501 F.2d at 717 (MacKinnon, J., concurring in part and dissenting in part)). The Department now maintains that this interpretation of *Haldeman* is not "precedential," Appellant's

12

Br. 33–34, but the court's interpretation of *Haldeman* was essential to this court's reasoning in *McKeever*. The dissenting opinion in *McKeever* rested principally on the view *Haldeman* held "that a district court retains discretion to release grand jury materials outside the Rule 6(e) exceptions." *McKeever*, 920 F.3d at 855 (Srinivasan, J., dissenting). In reaching the contrary conclusion, the majority in *McKeever* necessarily interpreted *Haldeman* to involve an application of Rule 6(e)'s "judicial proceeding" exception rather than an exercise of inherent authority.

Neither in *Haldeman* nor *McKeever* did this court explain in detail why impeachment qualifies as a judicial proceeding, although the *en banc* court in *Haldeman* embraced Chief Judge Sirica's analysis, 501 F.2d at 715, and the term "judicial proceeding" in Rule 6(e) "has been given a broad interpretation by the courts," *In re Sealed Motion*, 880 F.2d 1367, 1379–80 (D.C. Cir. 1989) (collecting cases). The district court's interpretation in the instant case is further supported by traditional tools of statutory construction.

The constitutional text confirms that a Senate impeachment trial is a judicial proceeding. Article I provides that "[t]he Senate shall have the sole Power to try all Impeachments" and further states that when the President "is tried, the Chief Justice shall preside." U.S. CONST. art. I, § 3, cl. 6. The Framers of the Constitution also understood impeachment to involve the exercise of judicial power. For instance, Alexander Hamilton referred to the Senate's "judicial character as a court for the trial of impeachments." THE FEDERALIST NO. 65, at 396 (Clinton Rossiter ed., 1961). The district court here properly concluded that "the Federalist Papers, the text of the Constitution, and Supreme Court precedent all make clear" that "impeachment trials are judicial in nature and constitute judicial proceedings." *App. for*

13

*Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *14; *see id.* at *14–18.

The Department objects that the term "judicial proceeding" in Rule 6(e) is limited to judicial court proceedings because the ordinary meaning of the term "judicial proceeding" does not include a proceeding conducted before a legislative body and the two other provisions of Rule 6(e) that use the term "judicial proceeding," Rule 6(e)(3)(F), (G), unambiguously refer to a court proceeding. Appellant's Br. 18–19. These arguments are foreclosed by our precedent and are unpersuasive in any event. The term "judicial proceeding" has long and repeatedly been interpreted broadly, and courts have authorized the disclosure of grand jury materials "in an array of judicial and quasi-judicial contexts" outside of Article III court proceedings — such as administrative proceedings before the United States Tax Court, *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *12–13 (collecting cases). So understood, the term "judicial proceeding" encompasses a Senate impeachment trial over which the Chief Justice of the Supreme Court presides and the Senators constitute the jury. That Rule 6(e)'s other references may contemplate a judicial court proceeding is of little significance because "the presumption of consistent usage 'readily yields' to context," *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)).

Additionally, the historical practice supports interpreting Rule 6(e) to encompass impeachment. Rule 6(e) was adopted in 1946 to "codif[y] the traditional rule of grand jury secrecy" that was applied at common law. *Sells Eng'g*, 463 U.S. at 425. As summarized by the district court, Congress has repeatedly obtained grand jury material to investigate allegations of election fraud or misconduct by Members of Congress. *App.*

*for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at \*18–19. The Department dismisses this practice because no example involved impeachment proceedings. Appellant's Br. 29–32. But these examples evince a common-law tradition, starting as early as 1811, of providing grand jury materials to Congress to assist with congressional investigations. *See In re 1972 Grand Jury Report*, 370 F. Supp. at 1230. And historical practice reflects at least one example of a court-ordered disclosure of grand jury materials to the Committee — prior to the Rule's enactment — for use in its impeachment investigation of two federal judges. *Conduct of Albert W. Johnson and Albert L. Watson, U.S. District Judges, Middle District of Pennsylvania: Hearing before Subcomm. of the H. Comm. on the Judiciary*, 79th Cong., at 63 (1945).

Since Rule 6(e) was enacted, federal courts have authorized the disclosure of grand jury materials to the House for use in impeachment investigations involving two presidents and three federal judges. *See generally In re 1972 Grand Jury Report*, 370 F. Supp. 1219 (President Nixon); Order, *In re Madison Guar. Sav. & Loan Ass'n*, Div. No. 94-1 (D.C. Cir. Spec. Div. July 7, 1998) (*per curiam*) (President Clinton); *In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami* ("*Hastings*"), 833 F.2d 1438 (11th Cir. 1987) (Judge Alcee Hastings); Order, *Nixon v. United States*, Civ. No. H88-0052(G) (S.D. Miss. 1988) (Judge Walter Nixon), referenced in H.R. Rep. No. 101-36, at 15 (1989); and Order, *In re Grand Jury Investigation of U.S. District Judge G. Thomas Porteous, Jr.*, No. 2:09-mc-04346-CVSG (E.D. La. Aug. 6, 2009). It is only the President's categorical resistance and the Department's objection that are unprecedented. Oral. Arg. Tr. at 11–12; *McGahn*, No. 19-5331, Oral Arg. Tr. at 21 (Jan. 3, 2020). In interpreting the Rule, this established practice deserves "significant weight." *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 524–26 (2014) (emphasis omitted).

15

The Department worries that reading Rule 6(e) to encompass impeachment proceedings would create separation-of-powers problems. It maintains that the particularized need standard for all applicants under Rule 6(e)(3)(E) is "in considerable tension with the House's sole power of impeachment," Appellant's Br. 49, and would invite courts to "pass[] judgment on the legal sufficiency of a particular impeachment theory," *id.* at 50. Courts, however, regularly apply the particularized need standard to mitigate such concerns in the impeachment context because the district court need only decide if the requested grand jury materials are relevant to the impeachment investigation and authorize disclosure of such materials without commenting on the propriety of that investigation. *See, e.g.*, *Hastings*, 833 F.2d at 1446.

In any event, the Department's contrary interpretation of Rule 6(e) would raise as many separation-of-powers problems as it might solve. The Department implies its interpretation of the Rule strengthens the House by insulating its "sole power of impeachment" from judicial interference. But it ignores that courts have historically provided grand jury records to the House pursuant to Rule 6(e) and that its interpretation of the Rule would deprive the House of its ability to access such records in future impeachment investigations. Where the Department is legally barred from handing over grand jury materials without court authorization, judicial restraint does not empower Congress; it impedes it.

## IV.

The Committee has established a particularized need for the redacted grand jury materials it seeks. The party requesting the grand jury information must show (1) the material "is needed to avoid a possible injustice in another judicial

proceeding," (2) "the need for disclosure is greater than the need for continued secrecy," and (3) the "request is structured to cover only material so needed." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979). The Supreme Court characterizes "[t]he *Douglas Oil* standard [as] a highly flexible one, adaptable to different circumstances and sensitive to the fact that the requirements of secrecy are greater in some situations than in others." *Sells Eng'g*, 463 U.S. at 445. The Supreme Court has "repeatedly stressed that wide discretion must be afforded to district court judges in evaluating whether disclosure is appropriate." *United States v. John Doe, Inc. I*, 481 U.S. 102, 116 (1987). The district court's determination "is subject to reversal only if that discretion has been abused." *In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986).

The district court did not abuse its discretion. Special Counsel Mueller prepared his Report with the expectation that Congress would review it. *See* Vol. II at 1. The district court released only those materials that the Special Counsel found sufficiently relevant to discuss or cite in his Report. Moreover, the Department has already released information in the Report that was redacted to avoid harm to peripheral third parties and to ongoing investigations, thereby reducing the need for continued secrecy. Finally, the Committee's particularized need for the grand jury materials remains unchanged. The Committee has repeatedly stated that if the grand jury materials reveal new evidence of impeachable offenses, the Committee may recommend new articles of impeachment. Appellee's Supp. Br. 17 (Dec. 23, 2019); Oral Arg. Tr. at 59–60 (Jan. 3, 2020).

**A.**

The district court concluded that the Committee needed the redacted grand jury materials to "investigate fully," to "evaluate the bases for the conclusions reached by the Special

Counsel," and to "reach a final determination" about "whether the President committed an impeachable offense" a question "that the Special Counsel simply left unanswered." *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *35. The district court noted several features of the impeachment investigation that made the Committee's need especially compelling. First, because several individuals were convicted of making false statements either to Congress or in connection with the Special Counsel's investigation, the court found that the grand jury material at issue "may be helpful in shedding light on inconsistencies or even falsities in the testimony of witnesses called in the House's impeachment inquiry." *Id.* at *34. Second, the district court found that other sources of information — "such as the public version of the Mueller Report, the other categories of material redacted from the Mueller Report, congressional testimony and FBI Form 302 interview reports" — "cannot substitute for the requested grand jury materials." *Id.* at *36. Third, of striking significance, it was undisputed that "the White House has flatly stated that the Administration will not cooperate with congressional requests for information." *Id.* (citing Letter from Pat A. Cipollone, White House Counsel, to Representative Nancy Pelosi, Speaker of the House, et al. (Oct. 8, 2019)).

On appeal, the Department contends that a "generalized need" for grand jury materials "to 'complete the story' or 'investigate fully,' or simply to double-check that witnesses are not lying, has never been sufficient." Appellant's Br. 3. The Department asserts that the district court's analysis amounts to no more than an observation that the grand jury materials may be relevant to the Committee's inquiry, *id.* at 15, and that the district court should have conducted a redaction-by-redaction review to determine if the Committee actually needed the material, Oral Arg. Tr. at 26 (Jan. 3, 2020). Not only does this ignore the district court's detailed consideration of the

evidentiary obstacles confronting the Special Counsel's investigation, *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *37, the showing of particularized need required in the impeachment context is different. The *Douglas Oil* standard is "highly flexible" and "adaptable to different circumstances," *Sells Engineering*, 463 U.S. at 445, and courts have required a line-by-line or witness-by-witness determination only in cases where grand jury materials are needed in a future trial to impeach or refresh the recollection of a specific witness. *See, e.g.*, *In re Special Grand Jury 89-2*, 143 F.3d 565, 568, 571 (10th Cir. 1998); *United States v. Fischbach & Moore, Inc.*, 776 F.2d 839, 845–46 (9th Cir. 1985).

In the impeachment context, both this court sitting *en banc* in *Haldeman* and the Eleventh Circuit in *Hastings* concluded that when Congress seeks access to grand jury materials to assist in an impeachment investigation, district courts hand off all relevant materials to Congress without micromanaging the evidence. For example, in *In re 1972 Grand Jury Report*, Chief Judge Sirica ordered that the "Grand Jury Report and Recommendation" and accompanying grand jury materials be delivered to the Committee for use in an impeachment investigation involving the President. 370 F. Supp. at 1230–31. The Chief Judge reasoned that "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on *all the pertinent information*." *Id.* at 1230 (emphasis added). In making this determination, Chief Judge Sirica "carefully examined the contents of the Grand Jury Report" and stated that he was "satisfied that there can be no question regarding their materiality to the House Judiciary Committee's investigation," without parsing through the materials to determine which specific witnesses or lines of testimony were relevant to the Committee's investigation. *Id.* at 1221. This court, in turn,

expressed its "general agreement with his handling of these matters." *Haldeman*, 501 F.2d at 715. Similarly, in *Hastings*, the Eleventh Circuit authorized the disclosure of all grand jury materials to the Committee to assist in its impeachment investigation of Judge Hastings because "without full access to the grand jury materials, the public may not have confidence that the Congress considered *all relevant evidence*." 833 F.2d at 1445 (emphasis added).

Applying the particularized need standard in this way in the impeachment context avoids the potentially problematic second-guessing of Congress's need for evidence that is relevant to its impeachment inquiry. The Constitution grants to the House of Representatives the "sole Power of Impeachment." U.S. CONST. art. I, § 2, cl. 5. In an impeachment, the House serves as both the grand jury and prosecutor; it appoints managers to prosecute in the Senate the Articles of Impeachment that were approved by the House of Representatives. *See* H. Res. 798, 116th Cong. (2020) (appointing managers for the impeachment trial of President Donald J. Trump). The courts cannot tell the House how to conduct its impeachment investigation or what lines of inquiry to pursue, or how to prosecute its case before the Senate, *cf. Old Chief v. United States*, 519 U.S. 172, 186 (1997), much less dictate how the Senate conducts an impeachment trial, *Walter Nixon v. United States*, 506 U.S. 224, 230–33 (1993).

## B.

Here, the context makes readily apparent that the need for disclosure is not only greater than the need for continued secrecy but that the district court findings confirmed the particularity of the need. The need for grand jury secrecy is reduced after the grand jury has concluded its work, but courts still "must consider . . . the possible effect upon the functioning of future grand juries" such as the need to encourage "frank and

full testimony," *Douglas Oil*, 441 U.S. at 222, and the risk that "persons who are accused but exonerated by the grand jury" will face "public ridicule," *id.* at 219. The district court concluded upon reviewing in detail the findings in the Mueller Report that any remaining secrecy interests in the redacted grand jury materials were readily outweighed by the Committee's compelling need for the materials in order to determine whether, or to what extent, links existed between the Russian government's efforts to interfere in the 2016 United States presidential election proceedings and individuals associated with President Trump's election campaign. *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *37–38.

Although the need for continued secrecy remains, the district court reasonably concluded that this need is reduced by the Committee's adoption of special protocols to restrict access to the grand jury materials in order to maintain their secrecy. *Id.* at *37; *see* Memorandum from Chairman Nadler to Members of the Committee on the Judiciary re Procedures for Handling Grand Jury Information (July 26, 2019). The Department objects that the Committee has the discretion to make the grand jury material public at any time. Appellant's Br. 45. But the district court, relying on Chief Judge Sirica's analysis, followed a tradition of satisfaction with these protocols. *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *37. As Chief Judge Sirica explained, such protocols "insure against unnecessary and inappropriate disclosure," dismissing concerns about leaks as "speculation." *In re 1972 Grand Jury Report*, 370 F. Supp. at 1230. Here, too, the Department offers "no basis on which to assume that the Committee's use of the [material] will be injudicious." *Id.* In fact, history supports the conclusion that such protocols are not an empty gesture. As the district court noted, "Congress has *still* not publicly disclosed the entirety of the Watergate grand

jury report that Chief Judge Sirica ordered be given to [the Committee] forty-five years ago, in 1974." *In re App. of Comm. on Judiciary U.S. House of Representatives for an Order Authorizing Release of Certain Grand Jury Materials*, No. 19-48, 2019 WL 5608827, at *3 (D.D.C. Oct. 29, 2019) (denying stay pending appeal).

Additionally, the risk of "public ridicule" decreases where, as here, there is already "widespread public knowledge about the details of the Special Counsel's investigation, which paralleled that of the grand jury's, and about the charging and declination decisions outlined in the Mueller Report." *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *37. *Cf. In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006); *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994). The Report was made available to the public and the Special Counsel testified about it in congressional hearings. *See, e.g.*, *Former Special Counsel Robert S. Mueller, III on the Investigation into Russian Interference in the 2016 Presidential Election: Hearing Before the H. Perm. Select Comm. on Intelligence*, 116th Cong. 49 (July 24, 2019). Moreover, the Department recently introduced the grand jury testimony of senior Trump advisor, Steven Bannon, at Roger Stone's criminal trial, *United States v. Stone*, No. 19-cr-00018 (D.D.C. Nov. 8, 2019), publicly disclosing grand jury materials concerning a player who was interviewed in connection with the Special Counsel's investigation but not indicted.

It is true that "courts have been reluctant to lift unnecessarily the veil of secrecy." *Douglas Oil*, 441 U.S. at 219. In the impeachment context, courts need to be especially careful in balancing the House's needs against various ongoing secrecy interests inasmuch as courts lack authority to restrict the House's use of the materials or withdraw them if improvidently issued or disseminated. In *Senate Permanent*

*Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017), this court suggested that the Speech or Debate Clause bars "ordering a congressional committee to return, destroy, or refrain from publishing" information already in its possession. *Id.* at 1086. But a compelling need for the material and the public interest may necessitate disclosure. *See Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557, 567 n.15 (1983). Special Counsel Mueller spoke directly to Congress in his Report, *see* Vol. II at 1, and stopped short of making any "ultimate conclusions about the President's conduct," *id.* at 8. The Department has failed to show in these circumstances that the district court abused its discretion in agreeing that the Committee had a compelling need to be able to reach a final determination about the President's conduct described in the Mueller Report. Along with the "public's interest in a diligent and thorough [impeachment] investigation," these considerations tip the balance toward disclosure. *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *38; *see In re 1972 Grand Jury Report*, 370 F. Supp. at 1227. "Public confidence in a procedure as political and public as impeachment is an important consideration justifying disclosure." *Hastings*, 833 F.2d at 1445.

## C.

Furthermore, the Committee's request was tailored to its need. *Douglas Oil*, 441 U.S. at 222. The Committee requested three categories of grand jury materials: (1) all portions of the Mueller Report that were redacted pursuant to Rule 6(e); (2) any portions of grand jury transcripts or exhibits referenced in those redactions; and (3) any underlying grand jury testimony and exhibits that relate directly to certain individuals and events described in the Mueller Report. Additionally, the Committee proposed a staged disclosure, starting with the first two categories of materials. *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *33. The district court

reasonably granted this request given the Committee's compelling need to be able to make a final determination about the President's conduct described in the Mueller Report, *id*. at *33, 35, 38, and stated that the Committee could file further requests articulating its need for the grand jury materials in the third category, *id.* at *33.

The Department's objections to this limited and structured disclosure are unpersuasive. First, the Department maintains that the disclosure includes a redaction in Volume II that the Committee conceded it did not need. Appellant's Br. 38; District Ct. Hearing Tr. at 37–38 (Oct. 8, 2019). The Committee made this concession without knowing what was underlying the redactions. The district court later reviewed *in camera* the grand jury material in Volume II, before authorizing the release of all grand jury material redacted from and referenced in both volumes of the Mueller Report. As to the Committee's need for the material, the court found that "[t]he grand jury material relied on in Volume II is indispensable to interpreting the Special Counsel's evaluation of this evidence and to assessing the implications of any 'difficult issues' for [the Committee's] inquiry into obstruction of justice." *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *35. Given the nature of the two volumes, the Department offered no persuasive reasons to conclude that the Committee's need for the redacted materials in Volume I was less compelling than the need demonstrated for Volume II. The court's determination, of course, is properly "infused with substantial discretion." *Douglas Oil*, 441 U.S. at 223.

Second, the Department maintains that the district court could not have evaluated whether the requested material was limited to material relevant to the Committee's need without conducting an *in camera* review of Volume I. Appellant's Br.

38. The district court reviewed the grand jury material redacted from Volume II of the Mueller Report but not from Volume I. As a result, the Department notes that the district court only examined five of the over 240 redactions in the Mueller Report. Reply Br. 23–24. Here, it was unnecessary for the district court to conduct an *in camera* review of the Volume I redactions. The Committee's request for the grand jury materials in the Mueller Report is directly linked to its need to evaluate the conclusions reached and not reached by the Special Counsel. In the Special Counsel Mueller's own estimation, his Report "contains . . . that information necessary to account for the Special Counsel's prosecution and declination decisions and to describe the investigation's main factual results." Vol. I at 13. The Committee states that it needs the unredacted material to review these findings and make its own independent determination about the President's conduct. The district court had no reason to question the Committee's representation because the Mueller Report itself made clear why the grand jury materials in Volume I were necessary for the Committee to review and evaluate in exercise of its constitutional duty. Courts must take care not to second-guess the manner in which the House plans to proceed with its impeachment investigation or interfere with the House's sole power of impeachment. *Cf. Walter Nixon*, 506 U.S. at 230–31.

Of course, courts must not simply rubber stamp congressional requests for grand jury materials. In cases where the connection between the grand jury materials and the Committee's impeachment investigation is not obvious, further inquiry by the district court may be needed. For instance, Committee counsel could be permitted to review the unredacted grand jury materials *in camera* to enable a more detailed explanation of the relevance of particular witnesses, portions of transcripts, or records. *See* Oral Arg. Tr. 62–64 (Nov. 18, 2019). Or the district court, in the exercise of its

discretion, might decide it should review the unredacted materials *in camera*, as occurred here at the Department's suggestion, with respect to Volume II of the Mueller Report. *See* Redacted Decl. of Bradley Weinsheimer ¶¶ 5–10 (Sept. 13, 2019).

But here, where the Special Counsel stopped short of making any "ultimate conclusions about the President's conduct," Mueller Report, Vol. II at 8, in part to avoid preempting the House's sole power of impeachment, *see id.* at 1, the Committee has established that it cannot "fairly and diligently" make a final determination about the conduct described in both volumes of the Mueller Report "without the grand jury material referenced" therein. *App. for Mueller Report Grand Jury Materials*, 2019 WL 5485221, at *35. In affirming the disclosure of "the entire grand jury record" to the Committee, the Eleventh Circuit similarly observed: "The recommendation of the judicial branch concerning impeachment of Judge Hastings was based on access to the whole grand jury record, and that same access should not be denied Congress." *Hastings*, 833 F.2d at 1445. Given the Committee's tailored request in the instant case, this court has no occasion to decide whether granting a request for "all" of the redacted grand jury materials would have been an abuse of discretion; that question remains for another day. Here, for reasons explained, the district court did not abuse its discretion by ordering the disclosure of all portions of the Mueller Report redacted pursuant to Rule 6(e) and any grand jury transcripts or exhibits referenced in those redactions without scrutinizing the Committee's need as to each redaction.

Accordingly, because a Senate impeachment trial qualifies as a "judicial proceeding" pursuant to Rule 6(e) and the Committee has established a particularized need for the requested portions of grand jury materials, the district court's

Order is affirmed. The distinction that our dissenting colleague reads into the district court's Order between authorizing and ordering release is not raised by either party and rests on a flawed premise. *See* Dissenting Op. at 1–3 (Rao, J.). Our colleague assumes that the House of Representatives is seeking compulsory judicial action against the Executive Branch. Because the Department of Justice is simply the custodian of the grand jury materials at issue however, the instant case is unlike inter-branch disputes where Congress issued subpoenas and directed Executive Branch officials to testify and produce their relevant documents. *See generally Comm. on the Judiciary v. McGahn*, 2019 WL 6312011 (D.D.C. Nov. 25, 2019); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008).

GRIFFITH, *Circuit Judge*, concurring: I join the opinion for the court, but I write separately to address the dissent's argument that the district court lacked jurisdiction to compel disclosure of grand jury materials under *Committee on the Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. Feb. 28, 2020). Unlike *McGahn*, this case does not involve a suit between the political branches over executive-branch documents or testimony. Instead, it involves an application for access to records of the grand jury, whose disclosure the district court has traditionally controlled.

As the dissent acknowledges, grand jury records do not belong to the Executive Branch. *See* Dissent at 28; *see also* Majority at 9-10; *In re Grand Jury Investigation of Cuisinarts, Inc.*, 665 F.2d 24, 31 & n.10 (2d Cir. 1981). Regardless of whether grand jury materials are "judicial records," *see* Dissent at 27-28, they do not become executive records simply because the Department of Justice stores them in file cabinets after the grand jury completes its investigation. The Department holds these records subject to the ongoing supervision of the district court. Accordingly, Rule 6(e) bars the Department from disclosing these records to Congress without court approval. *See* FED. R. CRIM. P. 6(e)(2)(B)(vi); *see also* J.A. 448 (letter from the Attorney General stating that he "d[id] not believe that [he] ha[d] discretion to disclose grand-jury information to Congress"). Federal courts, including courts in our own circuit, have approved the disclosure of grand jury materials to the House of Representatives in seven prior impeachment proceedings. *See* Majority at 13-14. Congressional applications for access to grand jury materials have thus traditionally been thought capable of (and indeed to require) judicial resolution. *Cf. Raines v. Byrd*, 521 U.S. 811, 819 (1997).

The dissent insists that "possession" is the "dispositive factor" in our jurisdictional analysis: When the court holds the grand jury materials, it may hand them over; when it does not, it may not compel the Department to do so. Dissent at 20-23.

This argument elevates form over substance. I do not take the dissent to dispute that the district court could have ordered the Department to deliver the grand jury materials for *in camera* review. Indeed, to assess particularized need, "[d]istrict courts are often required to conduct an *in camera* review of grand jury material requested under [Rule 6(e)'s judicial-proceeding exception]." *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1074 (D.C. Cir. 1998). Had the court done so, it would have taken possession of the requested materials and could have provided them directly to the Committee, instead of ordering the Department to hand them over. *See Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974) (en banc) (approving such a direct transfer); Dissent at 20-23 (recognizing that courts have provided grand jury materials to Congress when they possessed them). If the district court may do that, why can't it cut itself out as the intermediary?

I understand the dissent's concern that ordering the Executive Branch to provide grand jury records to Congress could make us a tool of the House in the exercise of its "sole power of impeachment." Dissent at 34-39. The Judiciary's proper place in an impeachment fight is typically on the sidelines. *See Nixon v. United States*, 506 U.S. 224, 228-36 (1993). But, as gatekeepers of grand jury information, we cannot sit this one out. The House isn't seeking our help in eliciting executive-branch testimony or documents. Instead, it's seeking access to grand jury records whose disclosure the district court, by both tradition and law, controls.

In an effort to bring this dispute under *McGahn*, the dissent creates a novel distinction between authorization and compulsion on which its analysis turns. But that distinction is difficult to square with our precedent and the district court's longstanding supervisory power over the grand jury. Our circuit has never distinguished between authorization and

compulsion under Rule 6(e). To the contrary, we've said that "[w]hen the court *authorizes* . . . disclosure [of grand jury records], it does so by *ordering* an attorney for the government who holds the records to disclose the materials." *McKeever v. Barr*, 920 F.3d 842, 848 (D.C. Cir. 2019) (emphases added) (internal quotation marks omitted); *see also In re Grand Jury*, 490 F.3d 978, 986 (D.C. Cir. 2007) ("The federal courts have the authority under Rule 6(e)(3)(E)(i) to *order* disclosure to grand jury witnesses of their own transcripts." (emphasis added)). The text of Rule 6(e) also suggests that courts may order the Department to transfer certain grand jury materials to another entity. Rule 6(e)(1) provides that "[u]nless the court orders otherwise, an attorney for the government will retain control of . . . any transcript [of the grand jury]." As the Department explained at oral argument, "it just doesn't seem like a plausible reading of Rule 6(e) that the District Court could authorize [disclosure] but that the Department of Justice would then say well, we don't want to turn over [the] information." Oral Arg. Tr. 7:20-23.

All that aside, the dissent's distinction between authorization and compulsion strikes me as untenable on its own terms. In the dissent's view, although "[a]uthorization of disclosure is part of the district court's supervisory power" over the grand jury, compulsion is not. Dissent at 1-2. The dissent explains this distinction by arguing that the court's "supervisory power is strictly limited to actions taken . . . in aid of the grand jury" and that compelling disclosure aids third parties rather than the grand jury. *Id.* at 2. But merely authorizing disclosure *also* aids third parties rather than the grand jury. The dissent therefore cannot explain why the district court has power to permit disclosure in the first place. Taken to its logical conclusion, the dissent's theory would seem to require outright dismissal of this case—a result that the

dissent agrees is contrary to history and precedent. *See id.* at 3-5; *see also* Majority at 10-14.

More broadly, I'm skeptical of the claim that the district court's supervisory authority *never* extends to aiding third parties. As the dissent concedes, the district court may issue compulsory process in the form of contempt orders and grand jury subpoenas. Dissent at 16-17. But when the court holds someone in contempt for breaching the grand jury's secrecy, it often aids not only the grand jury but also a third party whose private papers or statements have been unveiled. Moreover, the district court's local rules allow the court "on its own motion" to "ma[ke] public" grand jury materials "upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury." D.D.C. LOCAL CRIM. R. 6.1; *see also In re Motions of Dow Jones & Co.*, 142 F.3d 496, 504 (D.C. Cir. 1998). Under this rule, the district court could presumably compel the Department to make such materials available to the public. All this suggests that compulsory process—even for the benefit of third parties— falls within the district court's traditional supervisory power.

Finally, although I agree with the dissent that we have an independent obligation to assure ourselves of our jurisdiction, we need not chase jurisdictional phantoms. The relationship between the grand jury and Article III courts is, to put it mildly, "very under-theorized," Oral Arg. Tr. 5:21 (counsel for the Department); *see also id.* 62:24-63:17 (counsel for the Committee), and neither party has advanced the dissent's novel theory of that relationship. Given the district court's traditional supervisory power over the grand jury and the fact that grand jury records do not belong to the Executive Branch, I am satisfied that the court had jurisdiction to compel disclosure.

RAO, *Circuit Judge*, dissenting: The district court in this case took two distinct actions: first, it authorized disclosure of grand jury materials to the House Committee on the Judiciary, and second, it ordered the Department of Justice to release those materials to the Committee. The majority affirms both orders and treats them essentially as a single action pursuant to the district court's supervisory power over grand juries, and therefore outside the boundaries of Article III. Yet there are important distinctions between these two actions. While I agree that the court may authorize release under Federal Rule of Criminal Procedure 6(e), a judicial order compelling action by the executive branch has always been treated as an exercise of the Article III power.

The majority dismisses the Article III inquiry because grand jury records are different and outside the traditional constitutional boundaries. It is true that the grand jury exists separate from the three departments of the federal government and that in aiding the grand jury the courts may exercise limited non-Article III powers. Yet the ancient institution of the grand jury does not eviscerate the constitutional limits *between* the coordinate branches of the federal government. While the courts and the executive branch each have a distinct relationship to the grand jury and Rule 6(e) gives both branches shared responsibility for maintaining grand jury secrecy, the grand jury context does not change the powers of the judiciary in relation to the executive branch or to Congress. Thus, a court may compel action by the executive branch to release grand jury records only when a proper litigant meets the requirements of Article III.

As an initial matter, I agree with the majority that at the time of its order, the district court did not abuse its discretion in authorizing disclosure of the grand jury materials. An impeachment investigation is "preliminar[y] to or in connection with a judicial proceeding." FED. R. CRIM. P. 6(e)(3)(E)(i). Authorization of disclosure is part of the district

court's supervisory power and does not require Article III jurisdiction. Yet in the months following the Committee's initial petition, the House passed two articles of impeachment and the Senate conducted an impeachment trial and voted to acquit President Donald J. Trump. In light of these circumstances, I would remand to the district court to consider in the first instance whether the Committee can continue to demonstrate that its inquiry is preliminary to an impeachment proceeding and that it has a "particularized need" for disclosure of the grand jury records.

Separate from authorization, ordering DOJ to turn over the grand jury documents is an exercise of the Article III judicial power for which the Committee must have standing. The majority and the concurrence fail to identify a single case in which a court has compelled disclosure of grand jury materials to a party without standing. Waving the banner of grand jury tradition is not enough to overcome the fundamental principle of separation of powers that a court may order action by the executive branch only at the behest of a party with standing. The constitutional requirements of Article III standing do not disappear when a party seeks grand jury materials. The district court's non-Article III supervisory power is strictly limited to actions taken by courts in aid of the grand jury. Nothing in Rule 6(e) nor the district court's supervisory power changes the constitutional limits on the court's authority with respect to third parties who are not part of the grand jury process. Therefore, the Committee must have standing to obtain a judicial order compelling the Department to produce grand jury materials.

The Committee, however, lacks standing in this case. Under Article III, as confirmed by *Raines v. Byrd*, 521 U.S. 811 (1997), and our recent decision in *Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, 2020 WL

1125837 (D.C. Cir. Feb. 28, 2020), the Committee has no standing to enforce directly its subpoena to DOJ for grand jury materials.[1] The reasoning of *McGahn* means that the Committee also lacks standing to seek a compulsory order in a Rule 6(e) proceeding—such relief presents an interbranch dispute not traditionally cognizable by the judiciary. Although *McGahn* leaves open the possibility that a statute may create legislative standing, Rule 6(e) does not do so here. The Rule merely permits courts to authorize disclosure. It vests no right in third parties to obtain such authorization, much less a right to compulsory process to receive grand jury materials. Rule 6(e) thus provides no basis for the informational injury claimed by the Committee and cannot provide the prerequisites to the exercise of the Article III judicial power. Because the Committee lacks standing, I would vacate the district court's order compelling DOJ to disclose the grand jury materials. I respectfully dissent.

## I.

The primary question addressed by the majority concerns whether the district court could authorize disclosure to the Committee. On this point, I agree with the majority that the Committee's petition could fit within Rule 6(e)'s "judicial proceeding" exception because it sought the grand jury materials preliminary to a possible Senate impeachment trial,

---

[1] The House Judiciary Committee's subpoena to Attorney General William P. Barr, dated April 18, 2019, seeks "[t]he complete and unredacted version" of Special Counsel Robert S. Mueller III's *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* ("Mueller Report"), "[a]ll documents referenced in the Report," and "[a]ll documents obtained and investigative materials created by the Special Counsel's Office." *See* J.A. 190–97.

which has always been understood as an exercise of judicial power. The Constitution vests the Senate with the "sole Power to try all Impeachments." U.S. CONST. art. I, § 3, cl. 6. The Framers understood this clause to vest in the Senate a "distinct" non-legislative power to act in a "judicial character as a court for the trial of impeachments." The Federalist No. 65, at 337 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001); *see also Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 (1792) ("[N]o judicial power of any kind appears to be vested [in Congress], but the important one relative to impeachments."); *Trump v. Mazars USA, LLP*, 940 F.3d 710, 755 (D.C. Cir. 2019) (Rao, J., dissenting) ("[T]he Constitution confers upon the House and Senate limited judicial powers over impeachable officials."), *cert. granted*, 140 S. Ct. 660 (2019).

The Supreme Court has consistently recognized the Senate as a court of impeachment parallel to the federal courts. For example, in *Mississippi v. Johnson*, the Court noted that it was without authority to restrain the Senate in the conduct of an impeachment trial because the Senate was sitting "as a court of impeachment" and "this court [cannot] arrest proceedings in that court." 71 U.S. 475, 500–01 (1866); *see also Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880) ("The Senate also exercises the judicial power of trying impeachments."). Similarly, we have stated that doctrines ordering the relations between "state or coordinate federal court[s]" apply to the Senate when it "sits as the constitutionally-designated court of impeachment." *Hastings v. United States Senate*, 887 F.2d 332, 1989 WL 122685, at *1 (D.C. Cir. Oct. 18, 1989) (unpublished). The text of the Impeachment Trial Clause and its consistent interpretation confirm that when sitting for an impeachment trial, the Senate is a court and the trial a "judicial proceeding."

At the time of its decision, the district court did not abuse its discretion in concluding that the Committee had shown a "particularized need" for the grand jury materials. As the majority notes, the particularized need inquiry is a "highly flexible one" that is "adaptable to different circumstances." Maj. Op. 16 (quoting *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 445 (1983)). Impeachment is one such circumstance to which the standards for particularized need must be uniquely adapted. *Cf. In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*, 833 F.2d 1438, 1444 (11th Cir. 1987) ("*Hastings*") ("[A]pplying the requirements of rule 6(e) in this context, we hold, taking into account the doctrine of separation of powers, that a merely generalized assertion of secrecy in grand jury materials must yield to a demonstrated, specific need for evidence in a pending impeachment investigation.").

Although I agree that the authorization of disclosure was within the district court's discretion at the time it issued its decision, the district court's analysis was highly fact-bound. Rule 6(e)'s "preliminarily to or in connection with a judicial proceeding" exception to grand jury secrecy required the district court to find that the "primary purpose" of the Committee's inquiry was impeachment. *See United States v. Baggot*, 463 U.S. 476, 480 (1983). In analyzing that issue, the district court considered various actions and statements by legislators and legislative committees and concluded that the purpose of the Committee's investigation and its request for the grand jury materials was to "determine whether to recommend articles of impeachment." *See In re Application of Comm. on Judiciary, U.S. House of Representatives, for an Order Authorizing Release of Certain Grand Jury Materials*, 414 F. Supp. 3d 129, 149 (D.D.C. 2019).

Much has happened since the district court authorized disclosure in October. The House Judiciary Committee conducted an impeachment investigation, subpoenaed materials, and heard from witnesses. The House voted in favor of two articles of impeachment against President Trump. The Senate then conducted an impeachment trial in which it considered the House's evidence, determined that no further evidence was needed, and entered a judgment of acquittal.

In light of these developments, remand is necessary for the district court to address whether authorization is still warranted. A similar analysis of the Committee's application today requires ascertaining whether such investigations are ongoing and, if so, whether their "primary purpose" is to obtain the grand jury materials for impeachment. The Committee's request must fit within one of the Rule 6(e) exceptions and the only exception claimed by the Committee is that impeachment is a "judicial proceeding." Legislative oversight, for example, would not fit within this exception. If impeachment is no longer the primary purpose of the Committee's application, the court could not authorize disclosure because the grand jury records would not be sought "preliminarily to or in connection with" an impeachment trial or inquiry. FED. R. CRIM. P. 6(e)(3)(E)(i).

Similarly, remand is necessary for the district court to consider whether the Committee continues to have a particularized need for the requested grand jury materials, or whether the intervening developments have abrogated or lessened the Committee's need for these records. Once again, this requires a fact-intensive inquiry. *In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986) ("[A] district court [considering a Rule 6(e) application] must 'weigh carefully the competing interests in light of the relevant circumstances and standards.'" (quoting *Sells Eng'g*, 463 U.S. at 443)). In order to assess the Committee's ongoing need for these materials,

additional factual information is needed regarding the status of the Committee's investigations. The majority relies on assertions made in briefs filed by the Committee before the impeachment trial. Maj. Op. 16–18. This generalized interest standing alone does not speak to the fact-bound inquiry regarding the ongoing purpose and need for the materials. Remand is thus necessary for the district court to weigh the public interest in disclosure against the need to preserve grand jury secrecy in these changed circumstances. *See In re Sealed Case*, 801 F.2d at 1381. Because authorization of disclosure rests with the sound discretion of the district court, we should not exercise such discretion in the first instance.

* * *

A reasonable observer might wonder why we are deciding this case at this time. After all, the Committee sought these materials preliminary to an impeachment proceeding and the Senate impeachment trial has concluded. Why is this controversy not moot? The majority simply turns a blind eye to these very public events and the parties have not submitted any additional briefs; however, a few observations are worth noting. Mootness is a constitutional doctrine following from the Article III requirement that courts decide only live cases and controversies. *See Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013). Mootness, however, does not impact the district court's authorization of disclosure because authorization is a discretionary action under Rule 6(e)—it is part of the non-Article III supervisory power of the court over the grand jury. With that said, while mootness per se does not apply, the changed circumstances require remand for the reasons already stated. As to the order compelling DOJ to release the records, Article III limitations apply, as explained below. Yet because I conclude that the Committee lacks standing for compulsory process, mootness is irrelevant: The

district court lacked jurisdiction at the outset to compel DOJ to release the grand jury materials.

## II.

The constitutional problem presented by this case pertains not to authorization of disclosure, but to the separate question of whether the district court had jurisdiction to compel DOJ to release the grand jury materials to the Committee. In the months leading up to the House's formal initiation of an impeachment inquiry, the Judiciary Committee issued a subpoena to the Department of Justice for the grand jury materials relating to Special Counsel Robert S. Mueller III's investigation. U.S. Dep't of Justice, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017); *see also* J.A. 190–97 (House Judiciary Committee Subpoena to Attorney General William P. Barr (Apr. 18, 2019)). When the Department refused to comply and cited Rule 6(e) as an impediment to any release, the Committee sought authorization from the district court for the release of the materials. Notably, in its petition to the district court, the Committee sought only authorization of disclosure; it did not ask the court to compel DOJ to release the documents. J.A. 139–40. The district court authorized disclosure, but then went beyond the relief requested by the Committee and ordered the Department to turn over the materials. The Committee seeks to defend that order on appeal.

The Committee's Rule 6(e) application thus replaced legislative process (the Committee's subpoena) with judicial process (the district court's order compelling the Department to turn over the grand jury materials to the House). We have already held that the Committee lacks standing to use the courts to enforce its subpoenas against the executive branch. *See*

*McGahn*, 2020 WL 1125837, at \*16. Both the Department and the Committee maintain, however, that Rule 6(e) fundamentally changes the analysis in this case. They assert that the district court's order was an exercise of the supervisory power over the grand jury, such that the traditional Article III requirements of justiciability do not apply. That position, however, reads too much into Rule 6(e) and the district court's traditional supervisory authority.

The crux of my analysis turns on fundamental principles of separation of powers. First, the mere fact that this case involves a request for grand jury materials does not alter the basic constitutional requirement that a court order directing the executive branch to produce documents to a third party is an exercise of the Article III power. Here, DOJ has possession of the grand jury records under the terms of Rule 6(e)(1).[2] If DOJ declines to disclose the documents, a court may not grant a judicial order to disclose unless the Committee has standing. Second, nothing in Rule 6(e) changes this basic requirement and permits the district court to order disclosure of grand jury materials to a third party that fails to meet the requirements of standing. Finally, although district courts exercise some supervisory authority to aid the grand jury with its core functions, such authority traditionally has not extended to

---

[2] Both the Committee and DOJ characterize the requested documents as grand jury materials or papers. *See, e.g.*, DOJ Br. 1; Comm. Br. 1. It might fairly be questioned, however, whether the Mueller Report is in fact a grand jury document, as it was prepared by Robert Mueller in his role as the Special Counsel, serving within the Department of Justice. Thus, the Report might be considered executive branch papers, to which additional protections might attach. DOJ has not raised this argument, however, so I consider all the papers as being encompassed within the umbrella request for grand jury materials.

*ordering* the executive branch to release grand jury materials to third parties in general, nor to Congress in particular.

The majority's entire jurisdictional argument rests on the fact that the question "[was] not raised by either party." Maj. Op. 26; *see also* Concurring Op. 4 ("[N]either party has advanced the dissent's novel theory of that relationship."). Yet DOJ in fact distinguishes between authorizing and ordering disclosure when it asserts that ordering disclosure is an exercise of Article III power, but authorization of disclosure is not. *See* DOJ Supp. Br. 3–6. In any event, we have an independent obligation to ensure jurisdiction before exercising the judicial power. Here, the district court's order to DOJ for disclosure of the grand jury materials required an exercise of Article III power, because nothing in the grand jury context alters the court's power in relation to the executive branch. Suspending the standing requirements of Article III in this context would constitute an exception to justiciability not supported by the Constitution, Rule 6(e), or the general supervisory power over grand juries.

A.

The Committee and the Department argue that the district court's order does not implicate Article III because it was entered pursuant to the court's supervisory power over grand juries. It is true as a general matter that the supervisory power does not implicate "the essential attributes of the judicial power." *United States v. Seals*, 130 F.3d 451, 457 (D.C. Cir. 1997) (citation and quotation marks omitted). But the supervisory power "is a circumscribed one," *id.*, that cannot be extended by federal courts in a manner that transgresses constitutional or statutory limits, *see Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–55 (1988) ("[E]ven a sensible and efficient use of the supervisory power … is invalid if it

conflicts with constitutional or statutory provisions." (quotation marks omitted)). In *United States v. Williams*, the Court distinguished the limited supervisory power over the grand jury from the Article III power, and held that district courts cannot invoke the supervisory authority to take major actions "on their own initiative," or to "alter[] the traditional relationships between the prosecutor, the constituting court, and the grand jury itself." 504 U.S. 36, 50 (1992).

The district court's supervisory power cannot override constitutional requirements with respect to parties outside the grand jury process.[3] A judicial order compelling a party to take an action, be it a mandatory injunction, writ of mandamus, or other similar form of compulsory relief has always been understood as an exercise of the Article III judicial power. *See, e.g.*, *Georgia v. Stanton*, 73 U.S. 50, 75–76 (1867) ("[I]n order to entitle the party to the [injunctive] remedy, a case must be presented appropriate for the exercise of judicial power."). A court may therefore issue compulsory orders only at the behest of a party with Article III standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized.").

The judicial power is particularly implicated when a court issues a compulsory order to the executive branch. *See Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 618 (1838) ("[T]he

---

[3] As discussed in greater depth below, the courts have a limited ability to issue compulsory process to aid and protect grand jury investigations as part of their traditional supervisory capacity. This limited non-Article III power has never extended to issuing compulsory orders for the benefit of third parties, such as the Committee, who are external to the grand jury process. *See infra* 13–19.

authority to issue the writ of mandamus to an officer of the United States, commanding him to perform a specific act, required by a law of the United States, is within the scope of the judicial powers of the United States."). A court may direct the executive branch only when exercising its Article III powers. As the Court held in *Schlesinger v. Reservists Committee to Stop the War*, a plaintiff must present more than "generalized grievances" to "seek to have the Judicial Branch compel the Executive Branch to act in conformity" with constitutional provisions. 418 U.S. 208, 217 (1974). The Court emphasized the interrelation of standing and separation of powers and explained that ruling on constitutional issues "in the abstract" would "open the Judiciary to an arguable charge of providing 'government by injunction.'" *Id.* at 222.

The courts may interfere with the actions of a co-equal branch only when deciding a justiciable case or controversy. Consistent with these basic principles, during the course of these impeachment investigations, House Committees have not disputed that standing is required to enforce legislative subpoenas directed to the executive branch. Indeed, standing has been the key issue in recent congressional attempts to seek judicial enforcement of congressional subpoenas.[4]

B.

Despite these fundamental constitutional requirements, the Committee maintains it is "counterintuitive" to consider the requirements of Article III in the context of an application for grand jury materials because the district court may authorize

---

[4] *See McGahn*, 2020 WL 1125837; *Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020); *Maloney v. Murphy*, No. 18-5305 (D.C. Cir. filed Aug. 14, 2019); *U.S. House of Reps. v. Mnuchin, et. al.*, No. 19-5176 (D.C. Cir. filed June 14, 2019).

disclosure under Rule 6(e) and the court's supervisory power over the grand jury exists separate and apart from Article III. Comm. Supp. Br. 8–9. Intuitions aside, nothing in the text or structure of Rule 6(e) permits district courts to *order* disclosure of grand jury materials when a party does not otherwise have standing for such relief. Nor does the district court's residual supervisory authority extend to issuing compulsory process to the executive branch on behalf of third parties, rather than on behalf of the grand jury. While courts exercise some limited non-Article III powers when supervising the grand jury, the grand jury context does not allow the courts to suspend Article III when compelling action by the executive branch.

1.

Rule 6(e) does not alter the separation of powers by permitting a court to order disclosure by the executive branch absent standing by a third party. The Federal Rules of Criminal Procedure have the force and effect of law, and as the Court has explained, we interpret Rule 6(e) the same way we would a statute: by looking first to "the Rule's plain language." *United States v. John Doe, Inc. I*, 481 U.S. 102, 109 (1987); *see also United States v. Petri*, 731 F.3d 833, 839 (9th Cir. 2013). As in all cases of statutory interpretation, we must "accept [Rule 6(e)] as meaning what it says." *John Doe, Inc.*, 481 U.S. at 109 (quotation marks omitted). Under the plain text of Rule 6(e), a supervising court "may authorize disclosure" of grand jury materials under limited circumstances. FED. R. CRIM. P. 6(e)(3)(E).

Rule 6(e) codifies and reinforces the requirements of grand jury secrecy, subject only to certain enumerated exceptions. We have recently explained that the list of exceptions is exclusive and that the district court has no "inherent authority" to order disclosure outside of the circumstances provided for in

the Rule. *See McKeever v. Barr*, 920 F.3d 842, 846 (D.C. Cir. 2019), *cert. denied*, No. 19-307, 2020 WL 283746 (Jan. 21, 2020). Very few third parties will fit within these circumscribed exemptions, which do not include, for example, any provisions for Congress, members of the public, historians, or the media. As we have explained, "[t]he rule makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule." *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981); *see also United States v. Rutherford*, 509 F.3d 791, 795 (6th Cir. 2007) (explaining that Rule 6(e)(2)(B) is a powerful "prohibitory rule that prevents the government from disclosing grand jury matters except in limited circumstances"). The Supreme Court has explained the Rule "ensure[s] the integrity of the grand jury's functions" by "placing strict controls on disclosure." *Williams*, 504 U.S. at 46 & n.6. The text of the Rule's "judicial proceeding" exception, which specifies a precise "*kind* of need that must be shown" to justify disclosure, "reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy." *Baggot*, 463 U.S. at 480.

The text and structure of Rule 6(e) demonstrate that it does not create any distinct authority for compulsory process against the executive branch. The fact that the court "may authorize disclosure" suggests that the court cannot release the materials itself. It may only authorize others to do so, presumably the government attorneys who by default "retain control" of the grand jury materials. FED. R. CRIM. P. 6(e)(1). The plain meaning of "authorize" is to "give official permission for" or to "approve" or "sanction," not to compel or require. *Authorize*, Oxford English Dictionary (3d ed. 2014); *see also Authorize*, Webster's New International Dictionary of the English Language (2d ed. 1941) ("To give authoritative permission to

or for; to empower; warrant."). Notably, the Rule does not confer any right to disclosure, but rather leaves disclosure to the discretion of the district court. *See infra* 31–34. Thus, under Rule 6(e), authorizing disclosure does not include compulsion, but rather refers to lifting grand jury secrecy so that the executive branch attorney may disclose the materials.

Moreover, the Rule confers substantial authority on the government attorneys, not only in serving as custodian over grand jury materials, but in many instances allowing government attorneys to disclose without court permission. *See* FED. R. CRIM. P. 6(e)(3)(A), (C), (D). Even for those disclosures that must be authorized by the court, three of the five circumstances require the request for disclosure to be made by the government. FED. R. CRIM. P. 6(e)(3)(E)(iii)–(v). When a person petitions for disclosure of a grand jury matter, notice must be given to an attorney for the government. FED. R. CRIM. P. 6(e)(3)(F).

The government attorneys and the district court together play a gatekeeping and supervisory role over grand jury materials. Both the prosecutor and the district court have an institutional relationship to the grand jury; yet the Rule does not change other constitutional arrangements between the courts and the Executive. Nothing in Rule 6(e) suggests that the court may compel government attorneys to disclose grand jury materials to third parties who do not meet Article III requirements. To the contrary, Rule 6(e) establishes a balance, requiring the agreement of both the courts and the government lawyers for disclosure in most instances.

The majority's position, however, entrusts grand jury secrecy exclusively to the courts—allowing the district court not only to authorize, but to compel release. Maj. Op. 26. By contrast, DOJ's position that impeachment does not fit within

the "judicial proceeding" exception would leave grand jury secrecy solely to the Executive in this political context. The grand jury, however, is not an appendage of any one branch. Rule 6(e) should not be read to upend longstanding principles of separation of powers, nor to create supremacy of either the courts or the executive branch over the grand jury. *See United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977) ("[G]iven the constitutionally-based independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so. If the district courts were not required to meet such a standard, their 'supervisory power' could readily prove subversive of the doctrine of separation of powers.").

2.

Rule 6(e) codifies some aspects of grand jury practice and secrecy but does not cover every aspect of the district court's supervisory power. Thus, whether a district court's non-Article III power extends to issuing a compulsory order to the executive branch for the benefit of third parties must also be considered against the historical background of the supervisory power. Even though our circuit does not recognize any "inherent" power in the district court over grand jury disclosure, *see McKeever*, 920 F.3d at 849, some supervisory powers exist alongside Rule 6(e). For example, because a grand jury does not have the power to compel witness testimony, it may rely on the supervising court to issue and enforce compulsory process to aid the grand jury's investigative function. *Seals*, 130 F.3d at 457. Additionally, a court has the power to protect the integrity of grand jury proceedings by issuing contempt sanctions to attorneys who violate grand jury secrecy. *See In re Sealed Case No. 98-3077*, 151 F.3d 1059,

1070 (D.C. Cir. 1998). Even though such exercises of power by the district court go beyond the strictly administrative, they are closely connected to aiding the grand jury in the exercise of its core functions. Compulsory process ordered on behalf of and at the request of the grand jury is not an exercise of the Article III power, but instead part of the court's supervisory function over the grand jury. Judicial assistance in these limited circumstances requires no jurisdiction or standing by the grand jury—because the authority for such process inheres in the limited relationship between the grand jury and judiciary.

By contrast, third parties who seek grand jury information stand outside of the historic relationship between the grand jury and the court. As discussed below, there is no longstanding tradition of courts ordering disclosure of grand jury materials to third parties. *See infra* 33–35. When third parties seek the disclosure of such presumptively secret information, they cannot rely on the court's supervisory authority because such authority extends only to aiding the grand jury. For instance, we have drawn a sharp distinction between grand jury witnesses, who are part of the grand jury process, and third parties, who are not. *See In re Grand Jury*, 490 F.3d 978, 988 (D.C. Cir. 2007) ("Preventing a *third party* from reviewing a witness's grand jury testimony is essential to guarantee secrecy to witnesses; preventing *the witness* from reviewing the witness's own testimony is entirely unnecessary to guarantee secrecy to witnesses."); *United States v. Moussaoui*, 483 F.3d 220, 237 (4th Cir. 2007) ("We are certainly unaware of any long unquestioned power of federal district courts to order the Government to disclose non-public materials given to the defense in a criminal trial to third-party civil plaintiffs involved in litigation in another jurisdiction." (internal citation and quotation marks omitted)). Even the prosecutor, who may issue subpoenas on behalf of the grand jury, must ground his authority in the "grand jury investigation, not the prosecutor's

own inquiry" because "[f]ederal prosecutors have no authority to issue grand jury subpoenas independent of the grand jury." *Lopez v. Dep't of Justice*, 393 F.3d 1345, 1349–50 (D.C. Cir. 2005).

Only the grand jury and those who are part of the grand jury process—not a third party—may petition a court for compulsory process pursuant to the court's limited supervisory power.[5] The supervisory power of the district court exists to serve the functions of the grand jury, but the district court cannot use that power to evade the requirements of Article III or to expand judicial authority over the executive branch.[6] *See Chanen*, 549 F.2d at 1313 n.5 (admonishing against adopting a view of "judicial supervisory powers [over the grand jury] so broad in scope as to risk serious impairment of the constitutionally-based independence of the Executive, *i. e.*, the prosecutor, when acting within his own sphere").

------

[5] The concurring opinion suggests this argument somehow prevents authorization of disclosure, Concurring Op. 3; however, Rule 6(e) specifically allows district courts to authorize disclosure by government attorneys. *See supra* Part I. By contrast, neither the Rule nor the traditional supervisory power suggest the court may compel disclosure by the executive branch, and the concurrence offers not a single case or example to support the principle that district courts may compel disclosure to a party that lacks standing.

[6] Furthermore, the available evidence suggests that the scope of the supervisory power prior to the adoption of Rule 6(e) was similarly limited. Courts allowed grand jury secrecy to be breached only in very limited circumstances, and there is no evidence of a tradition of third parties resorting to the courts to compel disclosure. *See generally* Mark Kadish, *Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 FLA. ST. U. L. REV. 1, 16–22 (1996).

19

C.

This is not the first time Congress has sought grand jury information in connection with an impeachment proceeding. The handful of historical examples demonstrate that Congress has received grand jury materials; however, courts have not compelled disclosure of materials from the executive branch. Since the enactment of Rule 6(e), courts analyzing congressional requests for grand jury materials have been careful to authorize rather than compel disclosure and have recognized the separation of powers concerns present in such cases.

For example, the Eleventh Circuit upheld an order authorizing disclosure to the House Judiciary Committee pursuant to the judicial proceeding exception during the impeachment of Judge Alcee Hastings. *See generally Hastings*, 833 F.2d 1438. Authorization was all that was necessary because DOJ "stated that it ha[d] 'no objection' to this disclosure to the Committee." *Id.* at 1441–42. Similarly, in 2007, the House Judiciary Committee petitioned for disclosure of grand jury materials relevant to its impeachment inquiry into the conduct of Judge Thomas Porteous. *See In re Grand Jury Investigation of U.S. Dist. Judge G. Thomas Porteous, Jr.*, No. 09-mc-04346 (E.D. La. Aug. 6, 2009). The district court held that the Committee demonstrated a particularized need and authorized the Department to disclose the materials. *Id.* at *6. DOJ did not oppose the request, *id.* at *2, so no compulsory process was necessary.

Other courts have recognized that Congress should rely on legislative process to secure grand jury papers, even after authorization of disclosure. In *In re Grand Jury Investigation of Ven-Fuel*, a House Subcommittee Chairman moved for disclosure under Rule 6(e). 441 F. Supp. 1299 (M.D. Fla.

1977). Only after concluding the Chairman had standing,[7] the court determined that it would enforce the authorization of disclosure, but nonetheless "request[ed] that the Subcommittee issue *its own subpoena duces tecum* to the United States Attorney for the specific documents desired." *Id.* at 1307 (emphasis added) (internal citation omitted). The court stressed that the House should utilize the legislative process to enforce its legislative demand for documents from the executive branch. *Id.* at 1307–08. Respect for the political process counseled in favor of withdrawing the judiciary from such clashes to allow the political branches to rely upon their own processes to resolve disputes over grand jury materials.

Courts also considered congressional requests for grand jury records in impeachment proceedings prior to the adoption of Rule 6(e). Rule 6(e) gives possession of grand jury materials to government attorneys, but before Rule 6(e) possession of grand jury materials was not uniform—sometimes the records would be held by the district court and sometimes by the prosecutor. In the few recorded instances of congressional attempts to obtain grand jury materials prior to Rule 6(e), possession appears to have been the dispositive factor.[8] For

---

[7] The district court relied on *United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976), to support its determination regarding congressional standing. As we recognized in *McGahn*, *AT&T*'s standing holding is no longer tenable after *Raines*. *See* 2020 WL 1125837, at *11–12.

[8] The concurring opinion suggests, incorrectly, that the linchpin of my position is possession. Concurring Op. 1–2. Yet while the happenstance of physical possession appears to have been a critical factor prior to Rule 6(e)'s adoption, Rule 6(e)(1) now establishes the Executive as the designated custodian of grand jury materials. *See supra* 15–16. A court's power to utilize *in camera* review in connection with a Rule 6(e) application does not alter DOJ's duty to

example, during a 1945 impeachment inquiry into two judges, the House Judiciary Committee requested grand jury materials. The supervising district court directed its deputy clerk to testify before the Committee regarding the materials. *See, e.g.*, *Conduct of Albert W. Johnson and Albert L. Watson, U.S. Dist. Judges, Middle District of Pennsylvania: Hearing Before Subcomm. of the H. Comm. on the Judiciary*, 79th Cong. 62–65 (1946). While the majority classifies this as an example of "court-ordered disclosure," Maj. Op. 14, it fails to note that the direction was not to another branch, but simply to the court's deputy clerk. Because the district court possessed the grand jury records, disclosure did not require an exercise of Article III power, but merely an exercise of discretion to release papers within the court's control. By contrast, in a 1924 inquiry into two congressmen, the House failed to obtain grand jury materials that were in the possession of the Attorney General. 6 Cannon's Precedents of the House of Representatives of the United States § 402 ("Cannon's"); *see also* H.R. Rep. No. 68-282 (1924) (grand jury investigation of John W. Langley and Frederick N. Zihlman). The House does not appear to have considered petitioning the supervising court for an order compelling the Attorney General to turn over the materials.

Both before and after Rule 6(e), the federal courts have not utilized their limited supervisory authority to compel the

---

maintain grand jury documents. Neither of the cases cited by the concurrence supports the claim that the mere availability of *in camera* review can be used as a backdoor for a court to compel disclosure over the objection of the Executive to a party that lacks standing. To the contrary, both cases involved voluntary compliance by the Executive. *See In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1221 (D.D.C. 1974), *aff'd*, *Haldeman v. Sirica*, 501 F.2d714 (D.C. Cir. 1974); *In re Sealed Case No. 98-3077*, 151 F.3d at 1068.

production of grand jury materials to Congress. The historical precedents cited by the Constitutional Accountability Center in its amicus brief are not to the contrary. Not one of the cited examples involved a court issuing an order to compel disclosure of grand jury materials to Congress. Rather, these precedents all involved, at most, only authorization to release grand jury materials.[9] Thus, whenever Congress has received

---

[9] The 1811 Toulmin precedent cited by CAC and the majority did not involve compulsory process, judicial involvement of any sort, or even secret grand jury materials. *See* 3 Asher C. Hinds, Hinds' Precedents of the House of Representatives § 2488 ("Hinds'"). The other historical instances CAC cites similarly did not involve compulsory judicial process. *See* 2 Hinds' § 1123; H.R. Rep. No. 57-1423 (1902) (contested election in which the House received a grand jury report without evidence of judicial involvement); 6 Cannon's § 74 (1921 contested election in which grand jury materials were made available to the Senate with no evidence of judicial involvement); *id.* § 399 (1924 Senate conduct inquiry in which a district judge disclosed "some of the[] names" of grand jury witnesses known to the judge but does not appear to have produced "minutes of the grand jury proceeding" or the "documentary evidence which had gone before the grand jury" in response to a subpoena); *Haldeman*, 501 F.2d at 715 ("We think it of significance that the President of the United States, who is described by all parties as the focus of the report and who presumably would have the greatest interest in its disposition, has interposed no objection to the District Court's action" in disclosing a grand jury report the district judge possessed); *Hastings*, 833 F.2d at 1441–42 ("[T]he Department of Justice has stated that it has 'no objection' to this disclosure to the Committee."); *In re Cisneros*, 426 F.3d 409, 412 (D.C. Cir. 2005) (noting the Independent Counsel is "not under the aegis of either the court or a grand jury" and granting his petition to disclose materials to Congress); *In re Grand Jury Investigation of Judge Porteous*, No. 09-mc-04346, at *6–7 ("[T]he Department of Justice is authorized to disclose to authorized personnel of the House of Representatives" grand jury materials related to the Porteous

grand jury materials in the past, it was with the cooperation of the entity that possessed the materials—either the supervising court, if the materials were within its custody, or the executive branch, which turned over the materials without being ordered by a court to do so.[10] The foregoing examples demonstrate that although courts have sometimes *authorized* disclosure to third parties pursuant to their supervisory authority or under the judicial proceeding exception of Rule 6(e), courts have not *compelled* disclosure to third parties over the objection of the executive branch.

*   *   *

Even in the grand jury context, we are obliged to ensure that a dispute is within our Article III authority. Nothing in Rule 6(e), the traditional supervisory power, or historical practice changes the relationship between the coordinate branches or the general rule that a court exercises the Article III judicial power when it issues compulsory process to the executive branch.

III.

Because a compulsory order to the executive branch in aid of Congress is an essential attribute of the Article III judicial power, the Committee must establish standing in order to

---

investigation and "Department of Justice personnel may discuss" with the Committee "matters occurring before the grand jury.").

[10] The historical practice also casts doubt on DOJ's position that an impeachment cannot be a judicial proceeding. DOJ has previously consented to the release of materials for impeachment proceedings and specifically agreed that a "Senate impeachment trial qualifies as a 'judicial proceeding,' and that a House impeachment inquiry is 'preliminary to' the Senate trial." *Hastings*, 833 F.2d at 1440–41.

obtain judicial relief. This Part explains why the Committee lacks standing to seek compulsory process against the executive branch for the grand jury materials. First, in light of *Raines* and our court's recent decision in *McGahn*, the Committee would not have standing to seek judicial enforcement of its subpoena to DOJ. Because this case similarly presents a purely interbranch conflict, the Committee has no standing to seek a judicial order compelling DOJ to produce the same papers in the context of a Rule 6(e) proceeding. Second, although *McGahn* leaves open the possibility that legislative standing could be created by statute, Rule 6(e) creates no informational right to grand jury materials and the denial of such materials is not a judicially cognizable injury. Therefore, irrespective of whether a statute could establish congressional standing, Rule 6(e) does not. Finally, allowing standing in this context would run against historical practice and the limited role of the federal judiciary in our system of separated powers. *Raines*, 521 U.S. at 819 (standing requires the dispute to be "traditionally thought to be capable of resolution through the judicial process" (quotation marks omitted)).

## A.

"[T]he law of [Article] III standing is built on a single basic idea—the idea of separation of powers." *Raines*, 521 U.S. at 820 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). The Article III judicial power extends only to cases and controversies, disputes that present concrete and particularized injuries to the rights of individuals. A rigorous standing analysis restricts courts to disputes traditionally within the judicial power. "The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from

acting permanently regarding certain subjects." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The Court often decides interbranch conflicts, but only when such conflicts implicate the rights of private parties. *See Raines*, 521 U.S. at 820. Conflicts between the executive branch and Congress are generally settled in the political back and forth, because each branch has the constitutional motives and means to defend its own powers and "resist encroachments of the others." The Federalist No. 51, at 268–69 (James Madison).

When Congress brings suit against the executive branch, we must be especially careful to ensure that the suit is properly within our jurisdiction. As we recently explained, "we lack authority to resolve disputes between the Legislative and Executive Branches until their actions harm an entity 'beyond the [Federal] Government.' Without such a harm, any dispute remains an intramural disagreement about the 'operations of government' that we lack power to resolve." *McGahn*, 2020 WL 1125837, at \*3 (quoting *Raines*, 521 U.S. at 834 (Souter, J., concurring in the judgment)). In *McGahn*, we held that the Committee lacks standing to "invoke the jurisdiction of the federal courts to enforce its subpoena" for the testimony of former Counsel to the President Donald McGahn. *Id.* at \*7. *McGahn* made clear that generalized disputes between Congress and the Executive are not justiciable because standing in interbranch disputes is at odds with the constitutional separation of powers, the nature of the judicial power, and historical practice. *Id.*[11]

---

[11] As *McGahn* recognized, "we may adjudicate cases concerning congressional subpoenas that implicate the rights of private parties." 2020 WL 1125837, at \*16 (citing *Mazars*, 940 F.3d at 723). In *Trump v. Mazars*, the House Oversight Committee's subpoena was directed to the President's private accounting firm. Although the subpoena raised separation of powers concerns and was intertwined with the

26

The framework in *McGahn* governs the standing inquiry in the case before us. To begin with, the Committee would not have standing to enforce its April subpoena for the grand jury materials—a legislative subpoena against the executive branch must be enforced through legislative process. The fact that the Committee here seeks to use the courts to compel production of the same materials under the aegis of Rule 6(e) does not alter the standing analysis. The Committee asserts that its "continued lack of access to the material is a quintessential informational injury sufficient to confer standing." Comm. Supp. Br. 5. The nature of the interbranch dispute and the relevant constitutional bar in this case is indistinguishable from *McGahn*: In both cases the Committee seeks to invoke the compulsory powers of the federal judiciary in an informational dispute with the executive branch; however, the Committee's alleged "informational injury" is insufficient to confer standing because federal courts lack constitutional power to issue an

"official actions of the Chief Executive," *Mazars*, 940 F.3d at 752 (Rao, J., dissenting), it nonetheless involved private parties. When determining standing, we focus on the identity of the parties rather than the issues they seek to adjudicate. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). Unlike *Mazars*, this case presents a purely interbranch dispute between the House and the Executive, over which this court lacks jurisdiction. Moreover, this case arises in relation to a formal impeachment inquiry and trial, which raises concerns regarding justiciability. *See Raines*, 521 U.S. at 829 (no standing for suits that are "contrary to historical experience"); *(Walter) Nixon*, 506 U.S. 224, 234 (1993) ("[T]he Judiciary … were not chosen to have any role in impeachments."). These concerns were not present in *Mazars*. *See* 940 F.3d at 779 n.20 (Rao, J., dissenting) ("[T]he Committee has not relied on the impeachment power for this subpoena …. Congress, the Executive, and the courts have maintained that requests under the legislative and impeachment powers may be treated differently.").

injunction in a dispute between Congress and the Executive when no individual rights are at stake. *See McGahn*, 2020 WL 1125837, at *3 ("[T]he Committee's dispute with the Executive Branch is unfit for judicial resolution because it has no bearing on the 'rights of individuals.'" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803))).

The majority insists that this case "is unlike other inter-branch disputes" and distinguishable from *McGahn* because the grand jury is an "appendage of the court" and the Department of Justice is "simply the custodian of the grand jury materials." Maj. Op. 9, 26. The majority further maintains that "it is the district court, not the Executive or the Department, that controls access to … grand jury materials." *Id.* at 10. These sweeping claims cannot be squared with Rule 6(e), our cases, and the history of the grand jury.

The text and structure of Rule 6 make clear that the district court and the executive branch share responsibility for maintaining grand jury secrecy and for overseeing appropriate disclosures. As discussed above, government attorneys have authority to disclose in some circumstances without court approval; in other circumstances, the government attorney must approve the disclosure. *See, e.g.*, FED. R. CRIM P. 6(e)(3)(A)–(D), (E)(iii)–(v). In *McKeever*, we explained that the district court cannot release grand jury records on its own initiative because "Rule 6 assumes the records are in the custody of the Government, not that of the court" and the district court may authorize disclosure by an "attorney for the government." 920 F.3d at 848 (citing FED. R. CRIM. P. 6(e)(1)). The majority's contrary position relies in part on the reasoning of other circuits that have concluded grand jury records are "court records" over which the district court can exercise "inherent authority" because the grand jury is part of the judicial process. Maj. Op. 9 (citing cases). Yet we have recently

stated it is "not at all clear" that grand jury records are "judicial records" and noted that this court has rejected that conclusion in other contexts. *McKeever*, 920 F.3d at 848. Grand jury documents, like the grand jury itself, belong neither to the executive branch nor to the courts.

Contrary to the majority's classification of the grand jury as part of the judiciary, the Supreme Court has explained that the grand jury's "institutional relationship with the Judicial Branch has traditionally been, so to speak, at arm's length." *Williams*, 504 U.S. at 47. The Court has also recognized the important relationship between the prosecutor and the grand jury. *See, e.g.*, *Sells Eng'g*, 463 U.S. at 430 ("[A] modern grand jury would be much less effective without the assistance of the prosecutor's office…. [The grand jury] depends largely on the prosecutor's office to secure the evidence or witnesses it requires."). Government attorneys have strong institutional reasons for protecting grand jury secrecy in relation to ongoing and future prosecutions.

Thus, although the grand jury relies on both court and prosecutor for the exercise of its functions, it is an "appendage" of neither. The grand jury exists apart from all three branches. *See Williams*, 504 U.S. at 47 ("[The grand jury] has not been textually assigned, therefore, to any of the branches described in the first three Articles. It 'is a constitutional fixture in its own right.'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 712 n.54 (D.C. Cir. 1973))); *Chanen*, 549 F.2d at 1312 ("[T]he functions of the grand jury are intimately related to the functions of court and prosecutor …. But … the grand jury is not and should not be captive to any of the three branches." (internal citations omitted)). A district court may supervise the grand jury, but such supervision does not change the division of power between the court and the political branches.

Because this case is fundamentally an interbranch dispute, the House may seek judicial process against the executive branch only if it can demonstrate Article III standing. The Committee's claim must fit within the increasingly narrow exceptions for congressional standing. Here, the Committee asserts no individual harm to a lawmaker's personal interests. *Cf. Powell v. McCormack*, 395 U.S. 486 (1969) (finding a justiciable case or controversy for elected Member of Congress to sue for wrongful exclusion from Congress, which deprived him of salary and seat). The Committee here is "an institutional plaintiff" representing the House of Representatives. Comm. Supp. Br. 11 (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015)); *see also* H.R. Res. 430, 116th Cong. (2019) (authorizing House Judiciary Committee "to petition for disclosure of" the grand jury materials at issue "pursuant to Federal Rule of Criminal Procedure 6(e)"). Although the Court has suggested some limited standing for state legislatures raising institutional interests, *McGahn* forecloses institutional standing for Congress in suits against the executive branch. *See* 2020 WL 1125837, at \*3–8. *McGahn*, however, leaves open the question of whether a "statute authorizing a suit like the Committee's would be constitutional." *Id.* at \*15. It is doubtful whether this question in fact remains open after *Raines*, where the Court noted "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." 521 U.S. at 820 n.3. Nonetheless, this remains the only possible path for the Committee's standing in this case. Assuming a statute might be able to create standing in an interbranch dispute, I analyze whether Rule 6(e) creates a legally cognizable injury sufficient to sustain the Committee's standing.

B.

Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992). Yet as the Court recently explained, a plaintiff must *always* demonstrate that it has suffered a sufficiently "concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Thus, the mere fact that "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right," "does not mean that a plaintiff automatically satisfies the injury-in-fact requirement." *Id.* We have since elaborated on the Court's holding in *Spokeo*, explaining that "[f]or a statutory violation to constitute an injury in fact, then, the statute must protect the plaintiff's concrete interest—*i.e.*, afford the putative plaintiff a right to be free of a harm capable of satisfying Article III." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019).

The Committee maintains that it has standing because Rule 6(e) "authorizes court-ordered disclosures" when grand jury material is sought preliminary to a judicial proceeding, and the House is therefore "entitled to the material under the Rule." Comm. Supp. Br. 5. Contrary to the House's assertions, however, Rule 6(e) does not create an entitlement to invoke the courts' aid in compelling production of grand jury information. *See Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959) (Rule 6(e) does not confer upon an applicant "a 'right' to the delivery to it of the witness' grand jury testimony"); *see also In re Fed. Grand Jury Proceedings*, 760 F.2d 436, 439 (2d Cir. 1985) (explaining that there "is no 'absolute right' to … grand jury testimony" under the judicial proceeding exception). Rather, Rule 6(e) starts from the premise that "disclosure of matters occurring before the grand

jury is the exception and not the rule," and then proceeds to "set[] forth in precise terms to whom, under what circumstances and on what conditions grand jury information *may* be disclosed." *McKeever*, 920 F.3d at 844 (emphasis added) (citation and quotation marks omitted).

The decision to authorize the release of grand jury materials in connection with a judicial proceeding is thus committed to the sound discretion of the supervising court, which "may" authorize disclosure "at a time, in a manner, and subject to any other conditions that it directs." FED. R. CRIM. P. 6(e)(3)(E). Even then, disclosure is appropriate only if the court first concludes that "the party seeking material covered by the exception ha[s] made a sufficiently strong showing of need to warrant disclosure." *McKeever*, 920 F.3d at 846.

Rule 6(e) is thus unlike other statutes and regulations that *require* the disclosure of certain categories of information, such as the Freedom of Information Act. *See* 5 U.S.C. § 552 (providing that agencies "shall make available" to the public various categories of records and information); *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617–18 (D.C. Cir. 2006) (noting that under FOIA "[t]he requester is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive"). The Committee's attempt to analogize Rule 6(e) to such statutes is misguided. Each of the cases cited by the Committee to support its theory of informational injury-in-fact involved claims that a plaintiff was denied access to information in violation of an express statutory or regulatory mandate to disclose the information at issue. For example, the Federal Election Campaign Act of 1971 required that political committees make certain information public, and so an alleged failure to disclose such information would constitute a judicially cognizable injury. *See FEC v. Akins*, 524 U.S. 11, 21 (1998). Similarly, the Federal Advisory

32

Committee Act, 5 U.S.C. App. 2 § 10, requires release of information pertaining to certain committees advising the executive branch. The Court held that a deprivation of such information constituted an injury sufficient to confer standing. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449–50 (1989). Because these statutes created affirmative disclosure obligations, a plaintiff could establish an Article III injury by alleging a refusal to provide the required information.[12]

By contrast, Rule 6(e)(3) creates no such injury because it does not afford *any* concrete right. Rather, the Rule is purely permissive, providing that the district court "may authorize disclosure" of grand jury materials. The existence of an enumerated exception to grand jury secrecy under Rule 6(e)(3) is only the starting point. After determining an exception applies, a supervising court must determine, in its discretion, whether disclosure of the grand jury materials may be warranted under the circumstances and whether the applicant has demonstrated a "particularized need" for the materials. *See, e.g.*, *Sells Eng'g*, 463 U.S. at 442–43. Even this permissive standard refers only to authorization of disclosure, not to disclosure itself. Moreover, the Court has never held that Rule 6(e)(3) creates a private right of action for a third party to obtain injunctive relief. *See Pittsburgh Plate Glass*, 360 U.S. at 399. Although Rule 6(e)(3) allows the court to remove the

---

[12] The Committee's attempt to analogize Rule 6(e) to statutes like FOIA fails for an additional reason. Although Rule 6(e) "ha[s] the force of law," Comm. Supp. Br. 6–7 (quoting *Deaver v. Seymour*, 822 F.2d 66, 70 n.9 (D.C. Cir. 1987)), under the Rules Enabling Act, a federal rule of criminal procedure cannot vest any substantive right to information. 28 U.S.C. § 2072(b) ("Such rules shall not abridge, enlarge or modify any substantive right."); *see also Kontrick v. Ryan*, 540 U.S. 443, 453 (2004) ("[I]t is axiomatic" that rules promulgated pursuant to the Rules Enabling Act "do not create or withdraw federal jurisdiction.").

shield of grand jury secrecy through authorization, a third party must look elsewhere for a right of action to compel disclosure. *See Rutherford*, 509 F.3d at 793 ("[Rule] 6(e)(3)(E)(i), pertaining to the disclosure of grand jury documents, cannot be used to mandate such release.").

It is instructive that we have held other parts of Rule 6(e) can be enforced by third parties through a private right of action. For example, a third party has a "very limited" private right of action to enforce Rule 6(e)(2)'s secrecy requirement by seeking "injunctive relief or civil contempt of court through the district court supervising the grand jury." *In re Sealed Case No. 98-3077*, 151 F.3d at 1070 (quotation marks omitted). Rule 6(e)(2) uses the mandatory language "must not disclose," which courts have interpreted as vesting a private right that may be judicially redressable. Rule 6(e)(3), unlike Rule 6(e)(2), does not provide a legal entitlement to compel production of grand jury materials.[13] Thus, a third party such as the Committee that seeks a court order to compel production must demonstrate an independent legal right to such materials[14]

---

[13] Other statutes demonstrate that Congress knows how to vest district courts with the power to compel production of grand jury materials. For example, the Jencks Act provides that the government may be ordered to produce grand jury witness statements. 18 U.S.C. § 3500(b). The Act also provides remedies if the government fails to comply with a court's disclosure order. 18 U.S.C. § 3500(d).

[14] Legal rights to grand jury materials have been found in different contexts. *See, e.g.*, *Gibson v. United States*, 403 F.2d 166 (D.C. Cir. 1968) (criminal defendant asserting constitutional rights, such as the need to obtain potentially exculpatory evidence in a pending criminal trial); *Dennis v. United States*, 384 U.S. 855, 869–70 (1966) (criminal discovery); *Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557 (1983) (Section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b)); *United States v. Procter & Gamble*, 356 U.S. 677 (1958) (civil plaintiff's discovery rights). Our sister circuits have prevented

or possess a judicial device for compelling the materials, such as a subpoena. *See Rutherford*, 509 F.3d. at 795 ("[Rule 6(e)] does not authorize third parties to obtain grand jury materials from the government against the government's objections without a proper device for compelling the documents, such as a subpoena duces tecum.").

In sum, Rule 6(e) fails to create a legally cognizable informational right, the denial of which might constitute an injury sufficient to support congressional standing. I therefore need not opine on the broader question left open by *McGahn* regarding whether a statute can confer such standing in the first place.

## C.

In addition to conflicting with *McGahn* and the text of Rule 6(e)(3), the Committee's "attempt to litigate this dispute at this time and in this form is contrary to historical experience." *Raines*, 521 U.S. at 829. This type of interbranch dispute is not one "traditionally thought to be capable of resolution through the judicial process." *Allen*, 468 U.S. at 752 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). The fact that Congress seeks grand jury materials does not erase the constitutional boundaries between the judiciary and Congress with respect to impeachment, nor does it displace the separate

---

parties from using Rule 6(e)(3) to compel disclosure absent a legal right. For example, in *Moussaoui*, the Fourth Circuit rejected an attempt to use Rule 6(e) to "compel the Government to disclose non-public documents to crime victims involved in a civil action in a different jurisdiction." 483 F.3d at 230; *see also California v. B.F. Goodrich Co.*, 619 F.2d 798, 801 (9th Cir. 1980) (after authorizing disclosure, adding that "[t]he Attorney General need not disclose the materials if he objects to their disclosure").

legislative processes that Congress has for obtaining information.

The Committee initially sought authorization of disclosure for the Mueller grand jury materials preliminary to an impeachment proceeding. Yet impeachment is a separate process that occurs in the House and the Senate, without the interference or involvement of the courts. Parallel to the ordinary criminal process, the Constitution vests the power of impeachment and power to try all impeachments solely in the House and Senate respectively. U.S. CONST. art. I, § 2, cl. 2, § 3, cl. 6. The Constitution carefully separates the criminal process in the courts from the impeachment process in Congress. *See* U.S. CONST. art. I, § 3, cl. 7 ("[T]he Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."); The Federalist No. 65, at 340 (Alexander Hamilton). As the Supreme Court has explained, "the Judiciary, and the Supreme Court in particular, were not chosen to have any role in impeachments." *(Walter) Nixon*, 506 U.S. at 234.

The text and structure of the Constitution's provisions regarding the impeachment power confirm the separation of the courts from this process. The "risks from overlapping powers reach their apogee in a presidential impeachment trial." *(Walter) Nixon v. United States*, 938 F.2d 239, 242–43 (D.C. Cir. 1991), *aff'd*, 506 U.S. 224. Thus, courts should not interfere with the exercise of the impeachment powers, and the House does not have a positive constitutional right to assistance from the other branches in the exercise of its sole power of impeachment. *See (Walter) Nixon*, 506 U.S. at 231 (interpreting the word "sole" to exclude any judicial "assistance or interference" in an impeachment proceeding (citation omitted)). The House must look to its own powers or

those of the court of impeachments, the Senate, for compulsory aid in an impeachment investigation.

History confirms that both Congress and the courts have maintained the separation between impeachment and the judicial process. In the only three previous presidential impeachment investigations, as well as other impeachments, the House has never resorted to the courts to compel materials from the executive branch. As in *Raines*, "[i]t is evident from several episodes in our history that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." 521 U.S. at 826; *see also McGahn*, 2020 WL 1125837, at *6 ("Neither interbranch disputes (in general) nor interbranch information disputes (in particular) have traditionally been resolved by federal courts.").

During the impeachment investigation of President Nixon, the House Judiciary Committee recognized that seeking judicial assistance would likely weaken the authority of the House as well as exceed the judicial power of the courts. In its impeachment report, the Committee held that "it would be inappropriate to seek the aid of the courts to enforce its subpoenas against the President" because it would undermine "the constitutional provision vesting the power of impeachment solely in the House of Representatives." H.R. Rep. No. 93-1305, at 210 (1974) (noting also the "express denial by the Framers of the Constitution of any role for the courts in the impeachment process"). The Committee was concerned that judicial involvement would undermine its powers because "the court would necessarily have to determine whether the subpoenaed material was reasonably relevant to the inquiry." *Id.* at 212. The Committee also raised concerns that the courts would not have "adequate means" to enforce a congressional subpoena because the only viable remedy for the

President's noncompliance would be impeachment, which "would ultimately be adjudicated in the Senate." *Id.* The House agreed and, in line with this position, did not seek court orders to obtain grand jury materials. Instead, it received most Watergate grand jury materials by order of the President and on the petition of the Watergate grand jury, without objection from the executive branch. *See* Letter from Peter W. Rodino, Jr., Chairman, House Judiciary Committee, to John J. Sirica, U.S. District Judge (Mar. 8, 1974); *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. at 1221.

Similarly, during the impeachment of President Clinton, the House Judiciary Committee never resorted to the courts to compel production from the executive branch and instead relied on the addition of an article of impeachment alleging insufficient responses from the President to numerous interrogatories issued by the Committee. *See generally* H.R. Rep. No. 105-830 (1998). Moreover, neither the Judiciary Committee in the impeachment inquiry nor the Senate Whitewater Committee resorted to the courts to receive grand jury materials. *See* S. Rep. No. 104-191, at 9 (1995) ("[G]rand jury secrecy restrictions forbid the Committee's participation in discussions over subpoenas to the White House."). To the extent the Judiciary Committee received grand jury materials, it was not through a Rule 6(e)(3) application filed by the Committee. Rather, a member of the executive branch, the Independent Counsel, disclosed the materials to Congress pursuant to the Ethics in Government Act, 28 U.S.C. § 595(c), after receiving Rule 6(e) authorization from the Special Division of this court. *See* H.R. Rep. No. 105-795, at 32 (1998).

The impeachment of Andrew Johnson also conforms to this understanding. The "tedious job of taking testimony and

searching through documents" was conducted solely by the House, with no mention of judicial involvement. Michael Les Benedict, "The Impeachment of President Andrew Johnson, 1867–68" *in* Congress Investigates at 263–64; *cf. Mississippi*, 71 U.S. at 501 (noting it would be a "strange spectacle" for the Court to attempt to "restrain by injunction the Senate of the United States from sitting as a court of impeachment").

These historical precedents further reinforce the availability and effectiveness of legislative process to enforce informational requests. "Congress (or one of its chambers) may hold officers in contempt, withhold appropriations, refuse to confirm the President's nominees, harness public opinion, delay or derail the President's legislative agenda, or impeach recalcitrant officers." *McGahn*, 2020 WL 1125837, at *5. The ultimate form of accountability for the President is an article of impeachment. Impeachment is a power the House must exercise pursuant to its own processes and standards, and self-help is always available.

Moreover, when sitting as a court of impeachment, the Senate may issue the same compulsory process and orders as any other court. It may issue warrants, summons, and subpoenas, and even arrest and hold individuals who fail to comply. Indeed, the Senate Rules provide that the Senate, not the courts, makes determinations regarding relevancy and compulsory process. *See* S. Res. 479, 99th Cong. (1986), *reprinted in* Senate Manual § 176, 113th Cong. (2014).[15]

---

[15] During the impeachment trial of President Clinton, Chief Justice Rehnquist noted that a deposition could be taken only under the Senate's authority because "a deposition is an adjunct to a court proceeding, and it is only from the court that the authority to compel attendance of witnesses and administer oaths is derived." Letter from

39

Although the Committee now seeks to reassign the Senate's authority to the judiciary, this court has observed that the Article III courts must apply the same principles of comity and abstention to the Senate sitting as "the constitutionally-designated court of impeachment" as it would to any other "coordinate federal court." *Hastings*, 887 F.2d 332, 1989 WL 122685, at *1; *see also id.* ("[W]e have not found any case in which the judiciary has issued injunctive or declaratory relief intercepting ongoing proceedings of the legislative branch."). We should decline to issue compulsory process in an impeachment trial committed to the "sole" discretion of the Senate.

\* \* \*

Congress has historically relied upon its own constitutional powers to enforce subpoenas and informational requests against the executive branch. *See McGahn*, 2020 WL 1125837, at *7 ("Principles and practice thus agree: The Committee may not invoke the jurisdiction of the federal courts to enforce its subpoena."). "[P]olitical struggle and compromise" is the Constitution's chosen method to resolve interbranch disputes. *Barnes v. Kline*, 759 F.2d 21, 55 (D.C. Cir. 1984) (Bork, J., dissenting). With respect to grand jury records in the possession of the executive branch, no less than other disputes, the Committee must demonstrate Article III standing. Here, the Committee can point to no statutory entitlement to this information and the judicial relief it seeks is contrary to historical practice and the separation of powers. Accordingly, the Committee lacks standing to request a court order compelling DOJ to disclose the grand jury materials.

---

William Rehnquist, Chief Justice of the United States, to Tom Harkin, United States Senator (Jan. 25, 1999).

IV.

Fundamental principles of separation of powers and the relation of the grand jury to the three branches necessarily lead to the conclusion that the Committee cannot fight this interbranch dispute through the courts. Although it is well established that a court exercises the Article III judicial power when issuing a compulsory order to the executive branch, the fact that the Committee here seeks grand jury materials has obscured the ordinary justiciability requirements. When pursuing an impeachment investigation, the Committee may petition for authorization of disclosure under the "judicial proceeding" exception in Rule 6(e)(3). Nothing in the Rule, however, allows the district court to compel the executive branch to disclose grand jury materials to a party that lacks standing. The district court's supervisory power over the grand jury cannot expand judicial authority over the executive branch.

The majority refuses to consider the first and most fundamental question presented in every case—namely whether we have the power to decide it. Although the majority and concurrence refer in the abstract to the supervisory power, they cite not a single case in which a court has ordered the executive branch to release grand jury materials to a party without standing. Our duty to ensure that we have jurisdiction cannot be brushed aside by the expedient agreement of the executive branch and the House to support the Committee's standing. "[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." *Steel Co.*, 523 U.S. at 94 (quotation marks omitted). Acquiescence by the political branches cannot erase constitutional boundaries. *See, e.g.*, *Free Enter. Fund. v. Pub. Co. Accounting Oversight Bd.*,

561 U.S. 477, 497 (2010) ("[T]he separation of powers does not depend on … whether 'the encroached-upon branch approves the encroachment.'" (quoting *New York v. United States*, 505 U.S. 144, 182 (1992))); *Clinton v. New York*, 524 U.S. 417, 447 (1998) (support from both political branches for the Line Item Veto Act could not override the "finely wrought procedure commanded by the Constitution" (quotation marks omitted)); *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) ("The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review.").

In a similar vein, the courts should not defer to the political branches with respect to protecting the integrity of the Article III judicial power. Inevitably, there will be times when institutional interests lead Congress or the Executive to seek out the courts to resolve messy political matters. In this case, the House repeatedly asserted that it should be treated as would "every other litigant" seeking grand jury materials under Rule 6(e). Comm. Br. 51–52; *see also* Comm. Supp. Br. 12. The House chose to press its standing in the third branch, rather than rely on the full and awesome powers of the first.[16] Similarly, the Department of Justice here only selectively invokes Article

---

[16] By contrast, during the Nixon impeachment, the House Judiciary Committee resisted resort to the courts to enforce impeachment related process because judicial involvement in impeachment matters would be inappropriate, and moreover, would weaken Congress as an institution. *See* H.R. Rep. No. 93-1305, at 210–12 (1974); *see also* Raoul Berger, *Congressional Subpoenas to Executive Officials*, 75 COLUM. L. REV. 865, 893 (1975) ("[P]ossibly the Committee was reluctant to surrender a jot of its paramountcy in conducting an impeachment investigation; and it did have an ultimate sanction—to add an article for contempt of the House by refusal to comply with its subpoena. Presidential infringements on the prerogatives of the House are impeachable.").

III to press for its institutional self-interest. *See* DOJ Supp. Br. 3–6. The Constitution gives the Executive and Congress the constitutional means and motives to pursue the interests of their respective departments. In purely interbranch disputes, however, those constitutional means do not include judicial review.

Moreover, the grand jury context does not alter the justiciability requirements of Article III. The role of the courts in our system of separated powers is to preserve *individual* rather than *institutional* rights. *See Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion."); *McGahn*, 2020 WL 1125837, at *3 ("[T]he Committee's dispute with the Executive Branch is unfit for judicial resolution because it has no bearing on the 'rights of individuals.'" (quoting *Marbury*, 5 U.S. (1 Cranch) at 170)); *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 884 (1983). The Article III judicial power does not include the "amorphous general supervision of the operations of government." *Raines*, 521 U.S. at 829 (citation and quotation marks omitted). Our Article III courts are confined to the less flashy but nonetheless vital "species of contest which is termed a lawsuit." *Barnes*, 759 F.2d at 52 (Bork, J., dissenting) (quoting 1 A. De Tocqueville, Democracy in America 106–07 (T. Bradley ed. 1945)); *cf. Spokeo*, 136 S. Ct. at 1551 (Thomas, J., concurring) ("These limitations [on standing] preserve separation of powers by preventing the judiciary's entanglement in disputes that are primarily political in nature. This concern is generally absent when a private plaintiff seeks to enforce only his personal rights against another private party.").

In our constitutional democracy, most decisions are left to the people and their representatives. The courts play an essential role in saying what the law is, but they are not all-purpose umpires, available to referee any dispute between the other branches. Unless presented with a proper case or controversy, the courts do not advise or review the acts of the coordinate branches or the disputes that may arise between them. As discussed above, these separation of powers concerns are at their height in the impeachment context. The courts should have no part of assisting or interfering with impeachment proceedings. *See (Walter) Nixon*, 506 U.S. at 233–34. Institutional disputes between the executive branch and Congress often pertain to political arrangements and are fought under political standards, wholly outside the purview of the courts.

Furthermore, maintaining careful control over jurisdictional boundaries is one of the primary mechanisms of self-defense for the judiciary, because it avoids entangling unelected judges in the political sparring of the day. *See McGahn*, 2020 WL 1125837, at *4 ("Interbranch disputes are deeply political and often quite partisan…. By restricting the role of the judiciary, Article III preserves the 'public confidence' in the federal courts." (quoting *Valley Forge Christian Coll.*, 454 U.S. at 474)). The political branches seek judicial resolution of their interbranch dispute today, yet may tomorrow find the courts an inconvenient interference. If courts enter the business of resolving interbranch disputes, the branch losing the judicial contest has every incentive to discredit the motive and means employed by the judiciary—charges against which the judiciary has few protections when it has decided a case outside the boundaries of the judicial power. Moreover, a judicial decision in these disputes may allow the political branches to escape accountability for making their case to the American people and instead deflect responsibility to the

courts. That was not the system designed by our Framers. If the court picks sides in a political dispute, we not only compromise the boundaries of our own power, but also weaken the political accountability of the other branches.

Any doubt regarding the unsuitability of the courts for this interbranch dispute should be put to rest in the circumstances of this case. The Senate trial of President Trump concluded more than a month before publication of this opinion. Even when acting on an expedited basis, courts cannot move with the alacrity and speed of the political process. And indeed, that process has moved on without our decisions. The flurry of supplemental filings recounting the litigating positions of the President and the House in the impeachment trial, and arguing that such positions should affect our decisionmaking, demonstrates the practical impediments to judicial resolution of these issues.[17] In addition to the constitutional limits of the judicial power, the very structure of the judiciary reinforces that impeachments and related interbranch information disputes are not the business of the courts.

---

[17] *See, e.g.*, Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to Mark Langer, Clerk of the Court, U.S. Court of Appeals for the D.C. Circuit (Jan. 23, 2020) ("[O]ne of President Trump's defenses in the impeachment is that the House should have gone to court to obtain the information he withheld."); Letter from Mark R. Freeman, Department of Justice, to Mark Langer, Clerk of the Court, U.S. Court of Appeals for the D.C. Circuit (Jan. 28, 2020) ("The extensive, ongoing debate in the Senate over what evidence the Senate should or should not consider in the trial underscores the oddity of the Committee's view.").

45

The grand jury context does not eliminate the limits on the judicial power essential to the Constitution's separation of powers. Because I conclude that the House lacks standing to seek compulsory process against the executive branch in this context, I would vacate the part of the district court's order directing DOJ to disclose the grand jury materials. On the question of authorization, in light of changed circumstances, I would remand to the district court to evaluate in the first instance whether the Committee can demonstrate that it continues to have a "particularized need" for these grand jury materials "preliminarily to" impeachment proceedings. For the foregoing reasons, I respectfully dissent.